[S.F. No. 23370. June 16, 1976.]

TRUDE BIRKENFELD et al., Plaintiffs and Respondents, v.
CITY OF BERKELEY, Defendant and Appellant;
FAIR RENT COMMITTEE et al., Interveners and Appellants.

130

COUNSEL

Lois L. Johnson, City Attorney, Susan Watkins and Kathryn L. Walt, Assistant City Attorneys, Michael Lawson, Deputy City Attorney, Donald P. McCullum and Charles O. Triebel, Jr., for Defendant and Appellant.

Myron Moskovitz, Lawrence L. Duga, Barbara Dudley, Jeffrey J. Carter and Dennis Keating for Interveners and Appellants.

Edmund L. Regalia, Robert A. Belzer, Leslie A. Johnson and Miller, Starr & Regalia for Plaintiffs and Respondents.

Rich & Ezer and Mitchel J. Ezer as Amici Curiae on behalf of Plaintiffs and Respondents.

OPINION

**WRIGHT, C. J.**—In this case we consider the validity of an initiative amendment to the Charter of the City of Berkeley providing for residential rent control within that city. In a class action brought by plaintiff landlords the superior court declared the amendment void and enjoined the city from enforcing it principally on the ground that the evidence at a lengthy trial showed that the city was not faced with a serious public emergency of the sort the court deemed constitutionally prerequisite to imposition of rent controls under the police power. As hereinafter explained we have concluded that the existence of such an emergency is no more necessary for rent control than for other forms of economic regulation which are constitutionally valid when reasonably related to the furtherance of a legitimate governmental purpose, and that the facts established at the trial did not preclude the city from legislating on the subject of residential rent control. We have also concluded that

state law does not preempt the field of placing maximum limits on residential rents and that an enactment for that purpose could properly take the form of an initiative amendment to the city charter.

However, we also hold for reasons hereinafter stated that the Berkeley Charter amendment transgresses the constitutional limits of the police power not because of its objectives but because certain procedures it provides would impose heavy burdens upon landlords not reasonably related to the accomplishment of those objectives. The amendment would require a blanket rollback of all controlled rents to those in effect on August 15, 1971, (or to any lower rents in effect thereafter) and would prohibit any adjustments in maximum rents except under a unit-by-unit procedure which for reasons to be explained would be incapable of effecting necessary adjustments throughout the city within any reasonable period of time. Even if we were to adopt counsel's suggestion of a judicial postponement of the rent rollback date to one that is more current, the absence of adequate adjustment procedures would leave arbitrary maximum rents in effect far longer than would be reasonably necessary to the amendment's stated purpose of alleviating hardship caused by rising and exorbitant rents exploiting a housing shortage in the city.

In addition to controlling rents the charter amendment imposes prerequisites and restrictions upon eviction proceedings. As hereinafter explained we concur with the trial court's view that the charter amendment's requirement that the landlord obtain a "certificate of eviction" from the city before seeking to recover possession of a rent-controlled unit is invalid in that it conflicts with state law prescribing procedures for evicting tenants. In the absence of these procedural restrictions the charter amendment's prohibition against dispossession of tenants who are in good standing apart from the expiration of their terms would be a permissible means of enforcing validly imposed rent ceilings. However, such prohibition necessarily falls along with the charter amendment's constitutionally defective mechanism for adjusting maximum rents. Accordingly we affirm the judgment.

The parties before us include not only the plaintiff landlords and defendant city but also a group of organizations and individuals who filed a complaint in intervention praying that plaintiffs be denied all relief. The interveners generally represent two types of interests: (1) students, disabled persons and other low-income tenants occupying rental housing in Berkeley and (2) Berkeley residents asserting environ-

mental interests in preserving the existing housing stock and preventing an exodus of low-income residents. The interveners participated in the trial and have filed an appeal separate from that of defendant. The record on appeal is confined to the clerk's transcript.

The regularity of the proceedings by which the charter amendment was adopted is not questioned. The amendment was proposed by initiative,[1] was adopted by the city electorate on June 6, 1972, and apart from questions of its substantive validity took effect on August 2, 1972, when it was ratified by the Legislature.[2] Its full text is printed in the chapter laws (Stats. 1972 (Reg. Sess.) res. ch. 96, p. 3372) and is set out in the appendix hereto.[3]

The charter amendment declares that its purpose is to alleviate the hardships caused by a "serious public emergency" endangering the public health and welfare, especially that of "the poor, minorities, students and the aged," and affecting a substantial proportion of Berkeley tenants. The emergency is declared to consist of "[a] growing shortage of housing units resulting in a critically low vacancy rate, rapidly rising and exorbitant rents exploiting this shortage, and the continuing deterioration of the existing housing stock." (§ 1.)[4]

---

[1]The judgment below declared the initiative procedure constitutionally insufficient for enactment of municipal rent controls in that it failed to provide landlords with reasonable notice and the right to be heard on the merits of the measure prior to its adoption. After the judgment was entered we held in *San Diego Bldg. Contractors Assn. v. City Council* (1974) 13 Cal.3d 205 [118 Cal.Rptr. 146, 529 P.2d 570] that the initiative procedure can be used to adopt a zoning ordinance constituting a general legislative (as distinct from adjudicatory) act notwithstanding the lack of notice or opportunity for hearing on the part of affected property owners. Clearly the present rent control measure is a general legislative act susceptible of adoption by initiative under our holding in *San Diego Bldg. Contractors.* (See *id.*, at pp. 214-215.) Plaintiffs do not contend otherwise on this appeal.

[2]Approval by concurrent resolution of both houses of the Legislature was required by the then provisions of section 3 of article XI of the Constitution. In 1974 subdivision (a) of section 3 was amended to dispense with the necessity for the Legislature's approving city charter amendments.

[3]The initiative proceedings followed the city council's refusal at a public hearing on February 8, 1972, to place the rent control issue on the ballot. In 1969 the council had appointed a rental housing committee which made studies and in March 1971 issued an exhaustive report with recommendations but decided with one dissent not to recommend rent control.

[4]Unless otherwise indicated, all section references hereinafter are to Article XVII of defendant's charter, added by the charter amendment set out in the appendix to this opinion.

The measure provides for a rent control board (Board) of five popularly elected commissioners (§ 3) to fix and adjust maximum rents for all controlled dwelling units, administer restrictions on eviction proceedings, and exercise other regulatory and enforcement powers. Controls apply to all rented houses, apartments and rooming units other than (1) accommodations rented primarily to transient guests for periods of less than 14 days, (2) rental units in nonprofit homes for the aged or cooperatives, certain religious or medical facilities, or dormitories of an institution of higher learning, and (3) governmentally owned, operated, managed or subsidized rental housing. (§ 2, subds. (c), (h).)[5] The Board is required to fix a "base rent" for all controlled units by "administer[ing] a rollback of rents" to the lowest level in effect on or after August 15, 1971, or to a comparable prevailing level if the unit was not rented on that date.[6] (§ 4, subd. (a).) The rolled-back base rent becomes the maximum rent subject only to "individual rent adjustments." (§ 5.)

The Board is prohibited from granting any adjustment of the maximum rent even for an individual unit until it receives a petition from the unit's landlord or tenant and considers the petition at an adjustment hearing. (§ 6, subd. (a).)[7] Any landlord's petition must be accompanied by a certification from the city's building inspection service showing full compliance with state and city housing codes based on an inspection made within six months. The certification is only prima facie evidence of compliance and the Board may refuse an upward rent adjustment if it finds from other competent evidence that the rental unit is not in compliance "due to the landlord's failure to provide normal and

---

[5] There is no exception for new housing construction generally. The ballot argument in favor of the charter amendment (incorporated into the pleadings) stated: "Controlled rents will discourage high rent-quick profit ticky-tacky apartment construction, thus helping stop destruction of older homes and preserving Berkeley's unique environmental character. Rent control will help ensure that new housing construction serves those most in need—low income families, minorities, students and the aged."

[6] Upon the Legislature's approval of the charter amendment no rent of a controlled unit could be raised pending "the rollback of rents to the base rent level." (§ 4, subd. (a).) The trial court adjudged this "rent freeze" to be valid up to (but not after) the date of entry of the judgment, declaring its intent that tenants be relieved of liability for rent in excess of freeze levels incurred before that date.

[7] The separate provisions that the Board is "empowered" to roll back rents and to set and adjust maximum rents and that it may conduct investigations and issue regulations pertinent to its duties (§ 3, subds. (f), (g)) might in themselves seem to imply broader discretion to make general adjustments of rent levels, but any such implication is clearly dispelled by the specific restrictions described in the text.

adequate housing services." (§ 5.)[8] In considering a landlord's or tenant's petition for rent adjustment the Board must consider "relevant factors including but not limited to" (1) increases or decreases in property taxes, in operating or maintenance expenses and in rented living space or furnishings; (2) capital improvements; (3) extraordinary deterioration of the rented unit; and (4) any failure by the landlord to provide adequate housing services. (§ 5.)

Although the parties must be given 16 days' notice of the hearing on a rent adjustment petition (§ 6, subd. (b)), there is no expressed limit on the length of time within which the hearing may be held after the petition is filed. Hearings are open to the public and the parties may be assisted by attorneys, tenant union representatives, or any other persons they designate. (§ 6, subds. (d), (e).) The Board's official public record of the hearing, constituting "the exclusive record for decision," must include all exhibits required to be filed or in evidence, a list of participants, a summary of testimony, a statement of all materials officially noticed, findings of fact, rulings on exceptions or objections, and all recommended and final decisions and orders together with the reasons for each. (§ 6, subd. (f).) Any rent adjustment granted must be "supported by the preponderance of the evidence submitted at the hearing." (§ 6, subd. (g).) Petitions on rent-controlled units in the same building may be consolidated "with the written consent of a majority of the tenants." (§ 6, subd. (h).)

Three commissioners constitute a quorum of the Board and three affirmative votes are required for all rulings and decisions. (§ 3, subd. (i).) The Board must hold two regular meetings a month, and although there is no limit on the number of its special meetings, each commissioner's compensation of $50 per meeting is limited to $2,400 per year. (§ 3, subds. (h), (k).)

The Board is given additional responsibilities of acting upon applications for certificates of eviction submitted by landlords who desire to repossess rent-controlled units. (§ 7.) The charter amendment's provisions for this procedure and for limitations on the grounds for eviction are discussed hereinafter.

---

[8]Even if the noncompliance found by the Board is promptly cured, a subsequent petition for an upward rent adjustment is subject to summary rejection on the ground that a hearing on the unit's rent level was held within the previous 12 months. (§ 6, subd. (i).)

### City's Power to Provide for Rent Control
### by Initiative Amendment to Its Charter

■ It is contended that the defendant city was barred from imposing rent controls by the conceded absence of any state statute authorizing local legislation on the subject. As will be hereinafter discussed, the regulation of rents is proper only insofar as it is a valid exercise of the police power. ■ The Constitution itself confers upon all cities and counties the power to "make and enforce within [their] limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) A city's police power under this provision can be applied only within its own territory and is subject to displacement by general state law but otherwise is as broad as the police power exercisable by the Legislature itself. (*Stanislaus Co. etc. Assn.* v. *Stanislaus* (1937) 8 Cal.2d 378, 383-384 [65 P.2d 1305]; *In re Maas* (1933) 219 Cal. 422, 425 [27 P.2d 373].)

The decisions cited in support of the contended necessity for statutory authorization of municipal rent control measures are all from other jurisdictions and make clear that the involved cities did not have any broad grant of police power such as that enjoyed by California cities. (See *Old Colony Gardens, Inc.* v. *City of Stamford* (1959) 147 Conn. 60 [156 A.2d 515] (legislature's prior termination of municipal rent controls negated any implication of rent control power in city charter); *City of Miami Beach* v. *Fleetwood Hotel, Inc.* (Fla. 1972) 261 So.2d 801 (city charter powers strictly construed); *Ambassador East, Inc.* v. *City of Chicago* (1948) 399 Ill. 359, 365-367 [77 N.E.2d 803]; *Marshal House, Inc.* v. *Rent Review, etc. Board* (1970) 357 Mass. 709 [260 N.E.2d 200] (proscription against municipal enactment of "private or civil law governing civil relationships except as an incident to . . . an independent municipal power"); *Tietjens* v. *City of St. Louis* (1949) 359 Mo. 439 [222 S.W.2d 70] ("[a] city has no inherent police power"); *Wagner* v. *City of Newark* (1957) 24 N.J. 467 [132 A.2d 794].) On the other hand, the decisions construing grants of municipal power comparable in breadth to the police power of California cities under article XI, section 7, of our Constitution hold that such powers encompass the imposition of local rent controls. (See *Heubeck* v. *City of Baltimore* (1954) 205 Md. 203 [107 A.2d 99] (grant of "Police Power to the same extent as the State has or could exercise"); *Inganamort* v. *Borough of Fort Lee* (1973) 62 N.J. 521, 534, 536 [303 A.2d 298] (grant of "greatest power of local self-government consistent with the Constitution"; " 'grant of broad general police powers to municipalities' "); *Warren* v. *City of Philadelphia* (1955)

382 Pa. 380, 384 [115 A.2d 218] (grant of "all powers relating to its municipal functions . . . to the full extent that the General Assembly may legislate in reference thereto").)

■ Defendant and interveners properly concede that rent control is not a· municipal affair as to which a charter provision would prevail over general state law under article XI, section 5 of the Constitution.[9] (See *Bishop* v. *City of San Jose* (1969) I Cal.3d 56, 61-63 [81 Cal.Rptr. 465, 460 P.2d 137]; *Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 146-148 [82 P.2d 434, 126 A.L.R. 838].) Accordingly the charter amendment cannot be given effect to the extent that it conflicts with general laws either directly or by entering a field which general laws are intended to occupy to the exclusion of municipal regulation. (*Lancaster* v. *Municipal Court* (1972) 6 Cal.3d 805 [100 Cal.Rptr. 609, 494 P.2d 681]; *City of Santa Clara* v. *Von Raesfeld* (1970) 3 Cal.3d 239, 245-246 [90 Cal.Rptr. 8, 474 P.2d 976]; *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 859 [76 Cal.Rptr. 642, 452 P.2d 930]; *In re Hubbard* (1964) 62 Cal.2d 119, 127-128 [41 Cal.Rptr. 393, 396 P.2d 809].)[10]

The fact that the charter amendment prohibits landlords of residential units within the city from charging more than the maximum rents prescribed by a municipal rent control board under specified standards does not bring the amendment into conflict with general state law. California has no state rent control statute. There is of course extensive state legislation governing many aspects of landlord-tenant relationships,

---

[9]Article XI, section 5, subdivision (a) provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

[10]Interveners suggest that the Legislature's concurrent resolution approving the charter amendment on rent control (see fn. 2, *ante*) gave the amendment the effect of a state statute. The approval was not of a statute but of an amendment to a city charter that is subject to general laws with respect to matters that are not municipal affairs. (See *Eastlick* v. *City of Los Angeles* (1947) 29 Cal.2d 661, 665 [177 P.2d 558, 170 A.L.R. 225]; *City of Oakland* v. *Workmen's Comp. App. Bd.* (1968) 259 Cal.App.2d 163, 166 [66 Cal.Rptr. 283].) The approval was "by resolution and not by bill" and "[did] not *ipso facto* repeal laws generally applicable throughout the state." (*Wilkes* v. *City etc. of San Francisco* (1941) 44 Cal.App.2d 393, 395 [112 P.2d 759].) Our statement in *Taylor* v. *Cole* (1927) 201 Cal. 327, 334 [257 P. 40], that the Legislature's ratification of the charter amendment in that case "had all the essence of a plain legislative enactment" established no more than the equivalence between ratification and enactment for the purpose of foreclosing objections to procedural irregularities in the legislative process. (See *id.*, at p. 333; *Santa Clara County* v. *Superior Court* (1949) 33 Cal.2d 552, 555 [203 P.2d 1].)

some of which pertain specifically to the determination or payment of rent. (See, e.g., Civ. Code, § 827 (changing rent terms in tenancies of one month or less); Civ. Code, § 1935 (apportionment of rent); Civ. Code, § 1942 (right to deduct from rent for cost of repairs); Civ. Code, § 1942.5 (restricting retaliatory rent increases); Civ. Code, § 1947 (when rent is payable); Civ. Code, § 1950.5 (advance payments of rent).) But neither the quantity nor the content of these statutes establishes or implies any legislative intent to exclude municipal regulation of the amount of rent based on local conditions. (See *Galvan* v. *Superior Court, supra,* 70 Cal.2d at pp. 860-864.) The charter amendment's purpose of preventing exploitation of a housing shortage through excessive rent charges is distinct from the purpose of any state legislation, and the imposition of rent ceilings does not materially interfere with any state legislative purpose. (See *People* v. *Mueller* (1970) 8 Cal.App.3d 949, 954 [88 Cal.Rptr. 157].) Whether the relevant field be deemed to be rent control as such or a broader aspect of landlord-tenant relations (see *California Water & Telephone Co.* v. *County of Los Angeles* (1967) 253 Cal.App.2d 16, 27-28 [61 Cal.Rptr. 618]), there is no legislative indication of "a paramount state concern [which] will not tolerate further or additional local action." (*In re Hubbard, supra,* 62 Cal.2d at p. 128.)[11]

 It is contended that rent control is not within the municipal police power because it is "private law" purporting to regulate private civil relationships. Such an exception to municipal powers has received support from some commentators and was included in the "home rule" article of the Massachusetts Constitution in the form of a provision denying cities any inherent power "to enact private or civil law governing civil relationships except as an incident to an exercise of an independent municipal power." (Mass. Const., Amends., art. 89, § 7, subd. (5).) The Massachusetts Supreme Judicial Court construed this provision as preventing cities from enacting rent control measures in the absence of enabling legislation. (*Marshal House, Inc.* v. *Rent Review, etc. Board, supra,* 357 Mass. 709.)

The California Constitution contains no such "private law" exception to municipal powers. The fact that municipal imposition of rent ceilings necessarily affects private civil relationships by no means makes it

---

[11]We here decide only that general state law does not preclude a California city from imposing some form of rent control. We need not consider whether a city is free to create the judicial remedies for violation of rent ceilings provided by sections 9, 10 and 11 of the present charter amendment in view of our conclusion, discussed hereinafter, that the amendment's provisions for *fixing* maximum rents are constitutionally deficient.

unique among city police regulations. For example, a city ordinance specifying the liability insurance to be carried by a bus operator may give rise to a direct right of action against the insurer for injuries caused by the operator's negligence (*Milliron* v. *Dittman* (1919) 180 Cal. 443 [181 P. 779]), and violation of municipal building or housing codes may establish negligence in a tort action (*Finnegan* v. *Royal Realty Co.* (1950) 35 Cal.2d 409 [218 P.2d 17]), render a lease unenforceable as an illegal contract (*Howell* v. *City of Hamburg Co.* (1913) 165 Cal. 172, 176 [131 P. 130]), or give rise to a defense of breach of warranty of habitability in an action for rent or for recovery of possession based on nonpayment of rent (*Green* v. *Superior Court* (1974) 10 Cal.3d 616, 637-638 [111 Cal.Rptr. 704, 517 P.2d 1168]; *Hinson* v. *Delis* (1972) 26 Cal.App.3d 62 [102 Cal.Rptr. 661]). Thus, the mere fact that a city rent control measure would nullify tenants' liabilities to landlords for rent in excess of stated ceilings does not render the measure invalid.[12]

█ It is contended that the charter amendment even if otherwise valid could not be adopted through the initiative process without the concurrence of the city council. Several arguments are advanced in support of this contention; none of them has merit.

It is argued that the charter amendment's adoption violates the principle that the initiative is ordinarily deemed inapplicable where "the inevitable effect would be greatly to impair or wholly destroy the efficacy of some other governmental power." (*Chase* v. *Kalber* (1915) 28 Cal.App. 561, 569-570 [153 P. 397]; accord, *Simpson* v. *Hite* (1950) 36 Cal.2d 125, 134 [222 P.2d 225].) The governmental power that it is asserted the charter amendment would impair is the city council's power to raise tax revenues to carry on the municipal government. Past decisions invalidating initiative or referendum measures to repeal local tax levies have indicated a policy of resolving any doubts in the scope of the initiative or referendum in a manner that avoids interference with a local legislative body's responsibilities for fiscal management. (*Geiger* v. *Board of Supervisors* (1957) 48 Cal.2d 832, 839-840 [313 P.2d 545]; *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 628-629 [191 P.2d 426]; *Campen* v. *Greiner* (1971) 15 Cal.App.3d 836, 843 [93 Cal.Rptr. 525].)

Although the rent control measure in no way touches upon the city council's power to levy taxes, it is theorized that rent control would "cause fiscal chaos in the long run" by impairing the city's tax base. In

---

[12]We need not consider the existence or extent of the city's power to create remedies for the violation of rent ceilings. (See fn. 11, *ante.*)

support of this theory our attention is drawn to published articles depicting dire consequences attributed to rent control in New York City and other communities on the eastern seaboard. Interveners cite contrary material praising the effects of rent control. Although these disputed matters would be appropriate for consideration by a legislative body or the electorate in deciding whether to adopt a rent control proposal, they cannot be relied upon for the purpose urged here. Many sorts of initiative measures arguably affect the property tax base (e.g., the initiative zoning ordinances recently upheld in *San Diego Bldg. Contractors Assn.* v. *City Council, supra,* 13 Cal.3d 205, and *Builders Assn. of Santa Clara-Santa Cruz Counties* v. *Superior Court* (1974) 13 Cal.3d 225 [118 Cal.Rptr. 158, 529 P.2d 582]) but such speculative consequences do not constitute a prohibited interference by the initiative power with the function of a legislative body.

Another objection raised to the use of the initiative procedure to adopt the charter amendment is that the amendment prescribes detailed procedures for carrying out its substantive provisions and thus violates a supposed rule that the initiative cannot deal with administrative (as distinct from legislative) matters. However, the decisions cited in support of this objection concern the entirely different situation of an initiative ordinance that is deemed an improper interference with the local legislative body's administrative functions assigned to it by a state statute or other controlling instrument containing the legislative policies to be administered. (See *Simpson* v. *Hite, supra,* 36 Cal.2d at pp. 133-135; *Housing Authority* v. *Superior Court* (1950) 35 Cal.2d 550, 557-559 [219 P.2d 457]; *McKevitt* v. *City of Sacramento* (1921) 55 Cal.App. 117, 124 [203 P. 132].) The present charter amendment interferes with no preexisting legislative policy but instead performs the purely legislative function of introducing a new regulatory scheme.

■ It is argued that the use of the initiative process to adopt a municipal rent control measure is precluded by the unavailability to the electorate of factfinding procedures by which a legislative body can ascertain the existence of facts that would warrant the imposition of rent controls.[13] However, the cases relied upon for the argument deal only

---

[13]The electorate's lack of power to *compel* investigative committees or other agents to assemble information and make recommendations on particular issues does not prevent the voters from becoming well informed. Those voting on the present charter amendment had the benefit of a published report of the city council's rental housing committee and of arguments distributed with the ballots as well as the information disseminated during the campaign preceding the election.

with factfinding procedures that are attached as conditions precedent to particular grants of legislative powers. Thus the empowering provisions of the relevant statute or charter were construed in those cases as imposing such factfinding prerequisites as ascertainment of the "prevailing wage" before fixing county salaries (*Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626 [12 Cal.Rptr. 671, 361 P.2d 247]), the holding of hearings before enactment of a zoning ordinance by a general law city (*Taschner* v. *City Council* (1973) 31 Cal.App.3d 48, 61-64 [107 Cal.Rptr. 214]), or the declaration and existence of a "great necessity or emergency" before exceeding the maximum tax rate (*San Christina etc. Co.* v. *San Francisco* (1914) 167 Cal. 762 [141 P. 384]) or of urgency necessitating putting an ordinance into immediate effect (*In re Hoffman* (1909) 155 Cal. 114, 119 [99 P. 517]).

The power of the Berkeley electorate to amend their city charter through the initiative is derived from article XI, section 3, of the Constitution and is free from any such factfinding prerequisite. Accordingly, as we said in another case with reference to an initiative city ordinance, the charter amendment "must be deemed to have been enacted on the basis of any state of facts supporting it that reasonably can be conceived." (*Higgins* v. *City of Santa Monica* (1964) 62 Cal.2d 24, 30 [41 Cal.Rptr. 9, 396 P.2d 41].) Even if the city council itself had proposed the charter amendment (Cal. Const., art. XI, § 3, subd. (b)), we could not probe the council members' motivations for doing so (*County of Los Angeles* v. *Superior Court* (1975) 13 Cal.3d 721, 726-727 [119 Cal.Rptr. 631, 532 P.2d 495]) and would be required to judge the amendment's validity by its own terms rather than by the motives of or influences upon the legislators (*City and County of San Francisco* v. *Cooper* (1975) 13 Cal.3d 898, 913 [120 Cal.Rptr. 707, 534 P.2d 403]). The subjective motivations of the voters who petitioned for and approved the amendment's adoption are similarly irrelevant to our inquiry, which is therefore unaffected by any comparison between the factfinding procedures available to the electorate and to the city council.

■ Finally it is argued that initiative enactment of local rent control measures violates landlords' due process rights because tenants are in the majority and will always vote in favor of rent control as a result of their direct economic interest in the outcome.[14] The fact that the initiative

---

[14]The assumption that adoption of a city ballot measure to impose residential rent control is inevitable because tenants outnumber landlords is refuted both by the absence of rent control enactments in California communities other than Berkeley and by indications in the record that even the present measure had less than the complete

process results in legislation reflecting the will of the majority and imposing certain burdens upon landlords can hardly be deemed a ground for holding the legislation invalid. It is of the essence of the police power to impose reasonable regulations upon private property rights to serve the larger public good. (*Queenside Hills Co.* v. *Saxl* (1946) 328 U.S. 80, 82-83 [90 L.Ed. 1096, 1097-1098, 66 S.Ct. 850]; *Clemons* v. *City of Los Angeles* (1950) 36 Cal.2d 95, 102 [222 P.2d 439].) Moreover, this can be accomplished by the initiative, as in the case recently before us in which a city electorate initiated and adopted an ordinance that in effect prevented the owners of lots near the ocean from building high-rise structures that would have blocked views from larger areas located farther inland. (See *San Diego Bldg. Contractors Assn.* v. *City Council, supra,* 13 Cal.3d.205.) We expressly recognized the propriety of using the initiative process to enact local legislation adversely affecting only a small minority of the population in *Dwyer* v. *City Council* (1927) 200 Cal. 505 [253 P. 932], where we rejected a claim that a Berkeley zoning ordinance was beyond the initiative and referendum powers because its sole effect would be to rezone a tiny fraction of the city. We said:

"It is a fundamental tenet of the American system of representative government that the legislative power of a municipality resides in the people thereof, and that the right to exercise it has been conferred by them upon their duly chosen representatives. By the enactment of initiative and referendum laws the people have simply withdrawn from the legislative body and reserved to themselves the right to exercise a part of their inherent legislative power. . . . It is a characteristic of much legislation, especially in this age of intense specialization of occupations and interests, that it operates, to a greater or less degree, more directly upon one group or section of the population than upon another . . . ." (200 Cal. at p. 513.)

"The vice of respondents' argument consists in placing undue stress upon the sectional interest which residents of a particular district may be expected to have in restrictions more immediately affecting their district and in under-emphasizing the interest of the community as a whole in

support of tenants. The findings show that tenants constitute 63 percent of Berkeley's population; yet the charter amendment passed by only 52.5 percent of the vote. Moreover the declarations attached to the complaint in intervention, stating the interests of the original interveners (some of whom were later stricken as parties), show that the rent control measure received support from some *homeowners* who had such concerns as the preservation of the existing housing stock and the retention of low-income residents in the city.

the existence of a comprehensive zoning plan. *It must be presumed that the electorate will act in the interests of the entire city,* and of the part to be affected by the proposed legislation. If the law operates more directly upon only a part of the citizens evil intent or design cannot be presumed." (Italics supplied; 200 Cal. at p. 514.)[15]

The scope of the initiative power reserved to the people is to be liberally construed. (*Farley* v. *Healey* (1967) 67 Cal.2d 325, 328 [62 Cal.Rptr. 26, 431 P.2d 650]; *Blotter* v. *Farrell* (1954) 42 Cal.2d 804, 809 [270 P.2d 481]; *Ley* v. *Dominguez* (1931) 212 Cal. 587, 593 [299 P. 713].) Judicial protection of landlords' rights with respect to rent control enactments such as the present charter amendment lies not in placing arbitrary restrictions upon the initiative power but in measuring the substance of the enactment's provisions against overriding constitutional and statutory requirements.

### Conflict Between Charter Amendment's Eviction Provisions and General Laws

The charter amendment imposes two kinds of restraint upon eviction proceedings: It limits the grounds upon which a landlord may bring an action to repossess a rent-controlled unit (§ 7, subd. (a)) and it requires that a landlord obtain a certificate of eviction from the rent control board before seeking such repossession (§ 7, subds. (b)-(g)). These two types of restriction will be considered in order.

The permitted grounds for eviction can be grouped into three categories. One category consists of breaches of the tenant's duties to the landlord: failure to pay rent or to perform an obligation of the tenancy after notice, commission of a nuisance on or of substantial damage to the rented premises, conviction of using the premises for an illegal purpose, refusal of reasonable landlord access for repairs, inspection, or showing to a prospective purchaser, or transferring possession to an unauthorized

---

[15]Our language in *Hopping* v. *Council of City of Richmond* (1915) 170 Cal. 605, 617 [150 P. 977], that "[t]here may be grounds for excluding from the operation of [the initiative and referendum] powers legislative acts which are special and local in their nature" is not authoritative since we further stated that no such question was then before us and that "we express no opinion on the subject" (170 Cal. at p. 618). The decisions in *Chase* v. *Kalber, supra,* 28 Cal.App. 561 and *Starbuck* v. *City of Fullerton* (1917) 34 Cal.App. 683 [168 P. 583], holding the initiative and referendum inapplicable to local ordinances for street improvements to be financed by the local property owners involved cities without charters and were based on a construction of state street improvement statutes. All three of these cases were distinguished in *Dwyer* (200 Cal. at pp. 517-519).

subtenant. (§ 7, subds. (a)(1)-(4), (6)-(7).) A second category consists of the landlord's good faith intention to withdraw the unit from the rental housing market for occupancy by the landlord or specified relatives of the landlord (§ 7, subd. (a)(8)), or for demolition or conversion to nonhousing use (§ 7, subd. (a)(9)). The remaining category is the refusal of the tenant holding at the expiration of a lease ("rental housing agreement") to execute a written renewal or extension for the same duration as the original lease and on terms that are materially the same. (§ 7, subd. (a)(5).)[16]

These permitted grounds for eviction appear to cover most if not all of the grounds that would otherwise be available except that of termination of the tenancy. No other omitted grounds have been called to our attention and we assume for present purposes that the effect of the provision is simply to prohibit the eviction of a tenant who is in good standing at the expiration of the tenancy unless the premises are to be withdrawn from the rental housing market or the landlord's offer of a renewal lease has been refused.[17] ■ This prohibition is a reasonable means of enforcing rent ceilings by preventing landlords from putting out tenants because of their unwillingness to pay illegal amounts of rent or their opposition to applications for increases in rent ceilings. (See *Block* v. *Hirsh* (1921) 256 U.S. 135, 157-158 [65 L.Ed. 865, 871-872, 41 S.Ct. 458, 16 A.L.R. 165]; *Heubeck* v. *City of Baltimore, supra,* 205 Md. 203, 212.)

Plaintiffs contend that any regulation of the grounds for eviction is preempted by general state law. Code of Civil Procedure section 1161, subdivision 1, makes the continuation of a tenant's possession after expiration of the term a form of unlawful detainer for which the landlord may recover possession in summary proceedings under Code of Civil

[16]The last-mentioned provision does not require the landlord to offer the tenant a renewal lease but simply requires the tenant to accept any such offer that is made on pain of subjection to eviction. In the absence of a renewal lease the tenant's continued possession together with the landlord's acceptance of rent after expiration of the lease term creates a periodic tenancy. (Civ. Code, § 1945; *Renner* v. *Huntington etc. Oil & Gas Co.* (1952) 39 Cal.2d 93, 102 [244 P.2d 985].)

[17]Nothing in the charter amendment precludes a landlord from giving notice of the termination of a tenancy at will or periodic tenancy (see Civ. Code, §§ 789, 1946) or of a lease terminable at the landlord's option. Indeed such notice is a prerequisite to an application for a certificate of eviction. (§ 7, subd. (b).) What is prohibited is using the termination of the tenancy as a basis for eviction proceedings in the absence of another permissible ground for eviction.

Procedure section 1164 et seq. However, these statutory provisions are not necessarily in conflict with the charter amendment's provision forbidding landlords to recover possession upon expiration of a tenancy if the purpose of the statutes is sufficiently distinct from that of the charter amendment. (See *Galvan* v. *Superior Court, supra,* 70 Cal.2d 851, 859; *People* v. *Mueller, supra,* 8 Cal.App.3d 949, 954.) The purpose of the unlawful detainer statutes is procedural. The statutes implement the landlord's property rights by permitting him to recover possession once the consensual basis for the tenant's occupancy is at an end. In contrast the charter amendment's elimination of particular grounds for eviction is a limitation upon the landlord's property rights under the police power, giving rise to a substantive ground of defense in unlawful detainer proceedings. The mere fact that a city's exercise of the police power creates such a defense does not bring it into conflict with the state's statutory scheme. Thus, a landlord's violations of a city's housing code may be the basis for the defense of breach of warranty of habitability in a summary proceeding instituted by the landlord to recover possession for nonpayment of rent. (*Green* v. *Superior Court, supra,* 10 Cal.3d 616, 637-638; *Hinson* v. *Delis, supra,* 26 Cal.App.3d 62.) ■ Similarly, the statutory remedies for recovery of possession and of unpaid rent (see Code Civ. Proc., §§ 1159-1179a; Civ. Code, § 1951 et seq.) do not preclude a defense based on municipal rent control legislation enacted pursuant to the police power imposing rent ceilings and limiting the grounds for eviction for the purpose of enforcing those rent ceilings. (*Inganamort* v. *Borough of Fort Lee, supra,* 62 N.J. 521, 537;[18] *Warren* v. *City of Philadelphia, supra,* 382 Pa. 380, 385.)[19]

---

[18]After the *Inganamort* decision New Jersey adopted *state* legislation restricting landlords' rights to evict residential tenants upon termination of a lease or periodic tenancy. (N.J.S.A. 2A:18-61.1 et seq.; see *Gardens* v. *City of Passaic* (1974) 130 N.J.Super. 369 [327 A.2d 250].) This legislation was held to preempt the field to the exclusion of similar provisions in municipal rent control ordinances. (*Brunetti* v. *Borough of New Milford* (1975) 68 N.J. 576, 600-601 [350 A.2d 19, 32-33].)

[19]A contrary result was reached in *Heubeck* v. *City of Baltimore, supra,* 205 Md. 203, 210, where the provision in a city rent control ordinance prohibiting eviction of tenants in good standing even after expiration of their terms was held to conflict with a state statute permitting such evictions. The court applied a rule it had laid down in earlier decisions that local ordinances invalidly conflict with state law if they " 'prohibit acts permitted by statute or Constitution' " (205 Md. at p. 208). In California the question of whether a local enactment is excluded by state legislation is not necessarily concluded by the literal language of the pertinent statute but depends upon whether the state has preempted the field as indicated by the whole purpose and scope of the state legislative scheme. (*Abbott* v. *City of Los Angeles* (1960) 53 Cal.2d 674, 682 [3 Cal.Rptr. 158, 349 P.2d 974, 82 A.L.R.2d 385]; *Pipoly* v. *Benson* (1942) 20 Cal.2d 366, 371-372 [125 P.2d 482, 147 A.L.R. 515].)

In addition to limiting the substantive grounds for eviction the charter amendment prescribes procedures that a landlord must undergo as a prerequisite to seeking repossession of a rent-controlled unit. Before commencing unlawful detainer proceedings (Code Civ. Proc., § 1164 et seq.) the landlord is required to obtain a certificate of eviction from the rent control board. (§ 7, subds. (b), (g).) The Board must give notice of the application for the certificate to the tenant or tenants who then have five days in which to request a full hearing conducted under the rules governing hearings for adjustments in maximum rents. (§ 7, subds. (c), (e).) The hearing must be scheduled within seven days after it is requested (§ 7, subd. (d)) and the Board must grant or deny the certificate within five days after the hearing is held (§ 7, subd. (f)). However, no limit is stated for the time within which the Board must give the tenants notice of the application after it is filed or must act on the application if no hearing is requested following such notice. Moreover, there is an express provision that either party may seek judicial review of a decision of the Board to grant or deny a certificate. (§ 7, subd. (g); § 9.)

To be granted a certificate the landlord must carry the burden of showing not only the existence of permissible grounds for eviction and that the tenancy has been properly terminated by notice but also that there are "no outstanding Code violations on the premises" other than those "substantially caused by the present tenants." (§ 7, subds. (b), (e).) Moreover, the Board is forbidden to issue a certificate if it finds that "the eviction is in retaliation for reporting Code violations or violations of this Article [the charter amendment], or for organizing other tenants, or for enforcing rights under this Charter Amendment." (§ 7, subd. (e).) A finding adverse to the landlord on the existence of code violations on the premises or on the issues of retaliation precludes issuance of the certificate regardless of the existence of any of the grounds for eviction permitted by subdivision (a) of section 7.[20]

As already stated, the charter amendment is invalid to the extent that it purports to regulate a field that is fully occupied by general state law.

---

[20]In addition to these circumstances making denial of the eviction certificate mandatory, section 7, subdivision (e), through its incorporation of section 6, subdivision (i), appears to give the board discretion to reject an application for an eviction certificate summarily on the ground that issuance of the certificate was previously denied after a hearing held within the preceding 12 months, regardless of any intervening change of circumstances. (See fn. 8, *ante.*)

(*Healy* v. *Industrial Acc. Com.* (1953) 41 Cal.2d 118, 122 [258 P.2d 1]; fn. 10, *ante.*) Plaintiffs urge and the trial court found that to require a landlord to obtain a certificate of eviction before seeking to recover possession of a rent-controlled unit invalidly conflicts with sections 1159 through 1179a of the Code of Civil Procedure, which provide landlords with a summary procedure for exercising their rights of repossession against tenants. We agree. Unlike the limitations imposed by the charter amendment upon chargeable rents and upon the grounds for eviction, which can affect summary repossession proceedings only by making substantive defenses available to the tenant, the requirement of a certificate of eviction raises procedural barriers between the landlord and the judicial proceeding.[21] Thus if a tenant were permitted to raise as a defense in a summary proceeding that the landlord had failed to obtain a certificate of eviction, the terms of the charter amendment would not permit the landlord to meet the defense by showing that he could have qualified for the certificate had he applied for it but would preclude him from relief simply because he had never gone through the proper procedures before the rent control board.[22]

The summary repossession procedure (Code Civ. Proc., §§ 1159-1179a) is intended to be a relatively simple and speedy remedy that obviates any need for self-help by landlords. (*Kassan* v. *Stout* (1973) 9 Cal.3d 39, 43-44 [106 Cal.Rptr. 783, 507 P.2d 87]; *Jordan* v. *Talbot* (1961) 55 Cal.2d 597, 604-605 [12 Cal.Rptr. 488, 361 P.2d 20, 6 A.L.R.3d 161]; see *Lindsey* v. *Normet* (1972) 405 U.S. 56, 71-73 [31 L.Ed.2d 36, 49-50, 92 S.Ct. 862].) To require landlords to fulfill the elaborate prerequisites for the issuance of a certificate of eviction by the rent control board before they commence the statutory proceeding would nullify the intended summary nature of the remedy.

---

[21]Defendant's brief states: "There is nothing to prevent a landlord [from] proceeding under the unlawful detainer statutes while seeking the certificate of eviction from the Rent Control Board." To the contrary, subdivision (g) of section 7 provides: "A landlord who *seeks* to recover possession of a rent-controlled unit without *first* obtaining a certificate of eviction . . . shall be in violation of this Article. . . ." (Italics supplied.)

[22]We do not reach the question of whether the defendant city could have imposed the prerequisites for a certificate of eviction as direct substantive conditions upon the right to eviction. Interveners argue that defendant could implement its policies of preventing deterioration of existing housing and of limiting chargeable rents by depriving landlords of the right to evict tenants from units not conforming to housing code standards or in retaliation for the assertion of certain tenant rights. The argument is hypothetical as the charter amendment makes these matters the tests for the rent control board's issuance of a certificate of eviction rather than imposing them as conditions upon the right of repossession enforceable by the courts.

City charter provisions purporting to impose far less burdensome prerequisites upon the exercise of statutory remedies have been held to be invalid invasions of the field fully occupied by the statute. In *Eastlick v. City of Los Angeles, supra,* 29 Cal.2d 661, damages for personal injuries resulting from a fall on a broken sidewalk were recovered from the defendant city by a plaintiff who had filed a timely claim in full compliance with the applicable state statute prior to commencing the suit. The city contended that the claim was insufficient as filed because it did not include the more detailed information prescribed by the city charter, arguing "that its charter provision as to itemization of damages is merely supplementary to the general law—an additional, not a contrary requirement—and therefore is valid." (29 Cal.2d at p. 666.) We held that the statute had occupied the field of filing such claims against municipalities and that the city could not impose more onerous conditions with respect to the required contents of a claim. We rejected the city's contention that its auditing procedures required more detailed information, pointing out that the statute was intended to provide completely for the city's needs for information about claims in advance of suit. (29 Cal.2d at p. 667.)

Similarly in *Wilson v. Beville* (1957) 47 Cal.2d 852 [306 P.2d 789], we held that an inverse condemnation suit against a city could not be conditioned upon compliance with the claim-filing requirements of the city's charter. The state statutes fully occupy the field of assessing compensation for condemned property and therefore a city charter cannot make the recovery of such compensation more onerous.

Thus we conclude that the present charter amendment's requirement that landlords obtain certificates of eviction before seeking repossession of rent-controlled units cannot stand in the face of state statutes that fully occupy the field of landlord's possessory remedies. Insofar as the charter amendment simply prohibits eviction of tenants who are in good standing except for the expiration of their tenancies, it is a reasonable means of assuring compliance with maximum rent limits and does not conflict with statutory repossession proceedings even though making available a substantive defense to eviction. However, we have concluded for reasons to be explained that the charter amendment's provisions for fixing maximum rents are constitutionally defective. Hence the limitation on the grounds for eviction cannot stand as it has no legislative purpose in the absence of limits on rent. (See *F. T. B. Realty Corp.* v. *Goodman* (1949) 300 N.Y. 140, 148 [89 N.E.2d 865].) Although the charter amendment contains a severability clause (§ 12), such a clause

does not require that we salvage provisions which even though valid are not intended to be independently operative. (*Santa Barbara Sch. Dist.* v. *Superior Court* (1975) 13 Cal.3d 315, 331 [118 Cal.Rptr. 637, 530 P.2d 605].)

*Regulation of Maximum Residential Rents in*
*Berkeley as an Exercise of the Police Power*

We have thus far concluded (1) that in the absence of conflicting or preemptive state law the defendant city's police power within its territorial limits is as broad as the police power exercisable by the Legislature and (2) that general state law does not preclude the defendant city from imposing maximum limits on residential rents within its territory or from restricting the grounds for evicting tenants for the purpose of enforcing those limits insofar as such control of rents and evictions is a proper exercise of the police power. We now consider whether defendant could rightfully exercise its police power in this manner under the circumstances established by the record.

Plaintiffs urge and the trial court concluded that rents cannot constitutionally be controlled in the absence of an "emergency" which the trial court defined in the language of *Levy Leasing Co.* v. *Siegel* (1922) 258 U.S. 242, 245 [66 L.Ed. 595, 602, 42 S.Ct. 289], as a condition "so grave that it constitute[s] a serious menace to the health, morality, comfort, and even to the peace of a large part of the people of the State" (or in this case the city). The *Levy Leasing* decision and *Marcus Brown Co.* v. *Feldman* (1921) 256 U.S. 170 [65 L.Ed. 877, 41 S.Ct. 465], rejected due process objections under the Fourteenth Amendment to New York State statutes enacted in 1920 to deal with a grave housing shortage resulting from the cessation of building activities incident to World War I. The statutes provided in effect that during a period of approximately two years tenants should be immune from eviction if they paid a reasonable rent to be determined by the courts and were not "objectionable" and if the landlord did not seek to repossess the premises for personal use or demolition. Similar congressional legislation for the District of Columbia under which the rental owed by a tenant remained the same unless modified by a rent commission was upheld as against due process objections in *Block* v. *Hirsh, supra,* 256 U.S. 135. However, in *Chastleton Corp.* v. *Sinclair* (1924) 264 U.S. 543 [68 L.Ed. 841, 44 S.Ct. 405], the court made clear it would not tolerate extension of these rent controls beyond the period of the war emergency. Faced with a challenge to a rent reduction order of the District of Columbia Rent Commission

dated August 7, 1922, and effective as of the preceding March 1st, the court remanded the case for determination of whether the emergency justifying the statute still existed on the relevant dates in view of reduced government payrolls and new building activities in the City of Washington. The court stated that the increased cost of living would not in itself justify continuing the statute in effect and added that "if the question were only whether the statute is in force today, upon the facts that we judicially know we should be compelled to say that the law has ceased to operate." (264 U.S. at pp. 548-549 [68 L.Ed. at p. 844].)

These decisions concerning rent controls in Washington, D.C. and the State of New York during the aftermath of World War I are the last in which the United States Supreme Court has specifically considered the extent to which the due process clauses of the Fifth and Fourteenth Amendments allow state legislatures, or bodies exercising equivalent powers, to impose rent controls.[23] However, an examination of the evolution of the court's views in related fields of price and wage controls will demonstrate that the "emergency" doctrine invoked to uphold rent control measures of more than half a century ago is no longer operative as it was formulated as a special exception to limitations on the police power that have long since ceased to exist.

At the time of its rent control decisions in the early twenties a majority of the Supreme Court was of the view that the liberty protected by the due process clause included a freedom of contract which normally precluded either state legislatures or Congress legislating for the District of Columbia from regulating the amounts of prices or wages in businesses "not affected with a public interest." Legislation invalidated pursuant to this view included attempted uses of the police power to fix

[23]Neither of the Supreme Court cases dealing with rent controls imposed on a nationwide basis by Congress during and immediately after World War II reached this issue. In *Bowles* v. *Willingham* (1944) 321 U.S. 503 [88 L.Ed. 892, 64 S.Ct. 641], the court considered whether Congress' conceded authority under its war powers to control rents throughout the nation during the war could be exercised in particular ways and concluded, inter alia, that the exigencies of the war eliminated any constitutional doubts that might otherwise have existed as to the propriety of (1) empowering an administrator to set rents that were fair and equitable under standards generally applicable throughout an area without considering factors peculiar to individual landlords (321 U.S. at pp. 516-519 [88 L.Ed. at pp. 904-905]) or (2) putting rent-fixing orders into effect prior to hearing objections from landlords (321 U.S. at pp. 519-521 [88 L.Ed. at pp. 905-907]). *Woods* v. *Miller Co.* (1948) 333 U.S. 138 [92 L.Ed. 596, 68 S.Ct. 421], held that Congress could exercise its war powers to continue nationwide rent controls beyond the end of hostilities to cope with housing shortages caused by the demobilization of veterans and the reduction of housing construction during the war.

minimum wages for women (*Adkins* v. *Children's Hospital* (1923) 261 U.S. 525 [67 L.Ed. 785, 43 S.Ct. 394, 24 A.L.R. 1238]), to require compulsory arbitration of disputes over wages and hours in the food processing, clothing, fuel and transportation industries (*Wolff Co.* v. *Industrial Court* (1923) 262 U.S. 522 [67 L.Ed. 1103, 43 S.Ct. 630]), and to limit markups on resold theatre tickets (*Tyson & Brother* v. *Banton* (1927) 273 U.S. 418 [71 L.Ed. 718, 47 S.Ct. 426, 58 A.L.R. 1236]) and fees chargeable by employment agencies (*Ribnik* v. *McBride* (1928) 277 U.S. 350 [72 L.Ed. 913, 48 S.Ct. 545, 56 A.L.R. 1327]). In these cases the court distinguished its rent control decisions as involving "statutes . . . of a temporary character, to tide over grave emergencies." (*Tyson & Brother* v. *Banton, supra,* 273 U.S. at p. 437 [71 L.Ed. at p. 725]; accord, *Wolff Co.* v. *Industrial Court, supra,* 262 U.S. at p. 542 [67 L.Ed. at p. 1111]; *Adkins* v. *Children's Hospital, supra,* 261 U.S. at pp. 551-552 [67 L.Ed. at pp. 793-794].)

But during the thirties this restrictive view of the police power was completely repudiated. Heralding the court's change of view was *Nebbia* v. *New York* (1934) 291 U.S. 502 [78 L.Ed. 940, 54 S.Ct. 505, 89 A.L.R. 1469], where the court declared: "[T]here can be no doubt that upon proper occasion and by appropriate measures the state may regulate a business in any of its aspects, including the prices to be charged for the products or commodities it sells. [¶] So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio.*" (291 U.S. at p. 537 [78 L.Ed. at p. 957].)

Many of the prior restrictive decisions were expressly overruled. Upholding a women's minimum wage statute and overruling *Adkins* v. *Children's Hospital, supra,* 261 U.S. 525, the court pointed out that the Constitution does not speak of freedom of contract but only of liberty subject to due process of law, "and regulation which is reasonable in relation to its subject and is adopted in the interests of the community is due process." (*West Coast Hotel Co.* v. *Parrish* (1937) 300 U.S. 379, 391 [81 L.Ed. 703, 708, 57 S.Ct. 578, 108 A.L.R. 1330].) The sweeping nature

of the court's change of views and its direct relationship to the earlier rent control decisions is perhaps seen most clearly in *Olsen* v. *Nebraska* (1941) 313 U.S. 236 [85 L.Ed. 1305, 61 S.Ct. 862, 133 A.L.R. 1500], where a unanimous court upheld a statute regulating employment agency fees and not merely overruled *Ribnik* v. *McBride, supra,* 277 U.S. 350, but depicted a flood of its intervening decisions as engulfing and repudiating the philosophy and approach of the *Ribnik* majority.[24] The repudiated legal standard was described as one by which "the constitutional validity of price-fixing legislation, *at least in absence of a so-called emergency,* was dependent on whether or not the business in question was 'affected with a public interest'." (Fn. omitted; italics added.) (313 U.S. at p. 245 [85 L.Ed. at p. 1309].) The *Olsen* court thus made clear that existence of "a so-called emergency" is no longer a prerequisite to the constitutionality of legislation fixing prices regardless of whether the regulated enterprise is "affected with a public interest."

Notwithstanding this basic change in the United States Supreme Court's view of the state's power to regulate prices, the courts of several American jurisdictions have continued to treat the existence of a grave emergency as a constitutional prerequisite to any form of governmental rent control. In some instances the requirement has been held to be satisfied by a legislative declaration of emergency in the rent control statute itself and the absence from the record of any ground for treating the declaration as untrue. (*Amsterdam-Manhattan, Inc.* v. *City Rent & Rehab. Adm'n* (1965) 15 N.Y.2d 1014 [260 N.Y.S.2d 23, 207 N.E.2d 616]; *Lincoln Bldg. Associates* v. *Barr* (1956) 1 N.Y.2d 413 [153 N.Y.S.2d 633, 135 N.E.2d 801] (office space rent control); *Israel* v. *City Rent & Rehab. Adm'n* (S.D.N.Y. 1968) 285 F.Supp. 908; *Russell* v. *Treasurer & Receiver General* (1954) 331 Mass. 501, 507 [120 N.E.2d 388].) In other cases the lack of a sufficiently grave emergency has been set forth as a reason for holding rent control legislation invalid. (*Kress, Dunlap & Lane, Ltd.* v. *Downing* (3d Cir. 1960) 286 F.2d 212 (reversing summary judgment); *id.* (D. Virgin Is. 1961) 193 F.Supp. 874 (finding sufficient emergency as to low-rent housing but not as to high-rent housing or commercial property); *City of Miami Beach* v. *Fleetwood Hotel, supra,* 261 So.2d 861;[25] *Warren* v. *City of Philadelphia* (1956) 387 Pa. 362 [127 A.2d

---

[24]When the time came to overrule *Tyson & Brother* v. *Banton, supra,* 273 U.S. 418, and thus permit regulation of theatre ticket brokers' prices, the Supreme Court merely affirmed the judgment to that effect without opinion. (*Gold* v. *DiCarlo* (1965) 380 U.S. 520 [14 L.Ed.2d 266, 85 S.Ct. 1332], affirming 235 F.Supp. 817.)

[25]The majority opinion held that the Miami Beach City Council's determination that rent control was required by "an inflationary spiral and housing shortage" in the city

703].)[26] In none of these cases does the prevailing opinion discuss the continued viability of the emergency requirement in light of the United States Supreme Court's fundamental change of approach to the constitutionality of price regulation under the due process clause. (But see dissenting opn. in *Amsterdam-Manhattan, Inc.* v. *City Rent & Rehab. Adm'n, supra,* 15 N.Y.2d 1014, 1015.)

The courts that have considered the implications of this change have concluded that it renders the former emergency requirement obsolete. Thus, the Second Circuit Court of Appeals, in affirming dismissal of a landlord's action against a rent control official under the Civil Rights Act (42 U.S.C.A. § 1983 [42 U.S.C.S. § 1983]) stated that "we have no doubt that it [the United States Supreme Court] would sustain the validity of rent control today. . . . The time when extraordinarily exigent circumstances were required to justify price control outside the traditional public utility areas passed on the day that Nebbia v. New York, 291 U.S. 502, 539, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469 (1934), was decided. Whether, as some believe, rent control does not prolong the very condition that gave it birth, is a policy issue not appropriate for judicial concern." (*Eisen* v. *Eastman* (2d Cir. 1969) 421 F.2d 560, 567.) Similarly the New Jersey Supreme Court in sustaining the validity of municipal rent control ordinances recently observed that "rent control is, of course, but one example of the larger and more pervasive phenomenon of governmental regulation of prices under the police power. For constitutional purposes, rent control is indistinguishable from other types of governmental price regulation." (*Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1, 7].) Accordingly the New Jersey court concluded that the United States Supreme Court's abandonment of the emergency prerequisite for price regulation generally was fully applicable to rent control legislation. (*Id.* [350 A.2d at pp. 8-10].) The same conclusion was reached by the Maryland Court of Appeals in *Westchester West No. 2 Ltd. Part.* v. *Montgomery County* (1975) 276 Md. 448 [348 A.2d 856].

---

failed to establish the emergency required by the World War I rent control cases (*Marcus Brown Co.* v. *Feldman, supra,* 256 U.S. 170; *Levy Leasing Co.* v. *Siegel, supra,* 258 U.S. 242; *Chastleton Corp.* v. *Sinclair, supra,* 264 U.S. 543). A dissenting justice thought that evidence in the record showed the existence of an emergency which met the majority's test, but the majority opinion is silent regarding such evidence. (261 So.2d at pp. 802, 804, 810.)

[26]This decision may well rest on special rules of Pennsylvania law in view of the court's pronouncement elsewhere that "Pennsylvania . . . has scrutinized regulatory egislation perhaps more closely than would the Supreme Court of the United States" (*Pennsylvania State Board of Pharmacy* v. *Pastor* (1971) 441 Pa. 186, 191 [272 A.2d 487, 44 A.L.R.3d 1290]).

Before the present case California appellate courts have not been called upon to consider the validity of a rent control measure. However, the United States Supreme Court's previously described enlargement of its view of the scope of the police power to regulate prices and its consequent repudiation of any "emergency" prerequisite for price or rent controls find their parallels in our own decisions. ■ It is now settled California law that legislation regulating prices or otherwise restricting contractual or property rights is within the police power if its operative provisions are reasonably related to the accomplishment of a legitimate governmental purpose (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control* (1966) 65 Cal.2d 349, 359 [55 Cal.Rptr. 23, 420 P.2d 735]; *Allied Properties* v. *Dept. of Alcoholic Beverage Control* (1959) 53 Cal.2d 141, 146 [346 P.2d 737]; *Wholesale T. Dealers* v. *National etc. Co.* (1938) 11 Cal.2d 634, 643 [82 P.2d 3, 118 A.L.R. 486]) and that the existence of an emergency is not a prerequisite to such legislation (*Jersey Maid Milk Products Co.* v. *Brock* (1939) 13 Cal.2d 620, 637-638 [91 P.2d 577]; *Wholesale T. Dealers* v. *National etc. Co., supra,* 11 Cal.2d at pp. 654-655).[27]

Plaintiffs contend that a more pressing necessity is constitutionally required for regulation of rents than for the regulation of prices generally

---

[27]Both these decisions relied extensively on *Nebbia* v. *New York, supra,* 291 U.S. 502, in upholding legislation regulating prices and rejected efforts to confine the *Nebbia* principles to legislation of a temporary or emergency nature. The discussions of this point are as follows:

"*Amici curiae* seek to distinguish the Nebbia case from the instant case, and particularly call our attention to the fact that the New York statute was of a temporary duration while the California act is without any limitation as to duration, but they fail to show how this difference in the two statutes does in any way divest the legislature of the power to protect an industry from a perilous condition which is permanent in character. Furthermore, the rule appears to be well established that, 'Failure by the legislature to limit the operation of the law to a definite term does not render the law invalid so long as the conditions which justify the passage of the law remain.' (*People by Van Schaick* v. *Title & Mortgage Guarantee Co.,* 264 N.Y. 69 [190 N.E. 153, 96 A.L.R. 297].)" (*Jersey Maid Milk Products Co.* v. *Brock, supra,* 13 Cal.2d at pp. 637-638.)

"It is quite significant that the various cases relied upon by appellant in the instant case were cited in the dissenting opinion in the Nebbia case. The rule of the Nebbia case has been since followed. (*Bordens Farm Products Co.* v. *Ten Eyck,* 297 U.S. 251 [56 Sup. Ct. 453, 80 L.Ed. 669].) It is true that in these cases the United States Supreme Court emphasized the emergency nature of the legislation. The emergency referred to was in fact part of the background of the statutes. In determining judicial action, however, the character of the situation sought to be remedied rather than its abruptness is the governing factor. As we interpret the Nebbia case and the cases from this court hereafter referred to, in passing upon the validity of such statutes the sole constitutional yardstick by which they should be measured is the necessity for and the reasonableness of the regulation. The question as to whether the statute involves direct or indirect price fixing is a false quantity." (*Wholesale T. Dealers* v. *National etc. Co., supra,* 11 Cal.2d at pp. 654-655.)

because of the historic preference for real property exemplified by the legal presumption that breach of an agreement to transfer real property cannot be adequately compensated by money damages (Civ. Code, § 3387; *Remmers* v. *Ciciliot* (1943) 59 Cal.App.2d 113, 119-120 [138 P.2d 306]). This contention is without merit. Among the foremost examples of proper exercises of the police power are restrictions on the use of real property. (See, e.g., *Consolidated Rock Products Co.* v. *City of Los Angeles* (1962) 57 Cal.2d 515 [20 Cal.Rptr. 638, 370 P.2d 342]; *Miller* v. *Board of Public Works* (1925) 195 Cal. 477 [234 P. 381, 38 A.L.R. 1479].) Plaintiffs' contention was fully answered in the earliest of the rent control cases on which they rely, where the court referred to such restrictions on the use of real property as building height limitations and succinctly observed that "if, to answer one need, the legislature may limit height, to answer another it may limit rent." (*Block* v. *Hirsh, supra,* 256 U.S. 135, 156 [65 L.Ed. 865, 871].) The court also stated that to restrict landlords to "a reasonable rent" "goes little if at all farther than the restriction put upon the rights of the owner of money by the more debatable usury laws." (256 U.S. at p. 157 [65 L.Ed. at p. 871].) Moreover, the virtual equivalence under modern conditions between the renting of property for residential purposes and the purchase of consumer goods and services (see *Green* v. *Superior Court, supra,* 10 Cal.3d 616, 623, 627) points to our applying the same constitutional standards to the regulation of rents that we apply to the regulation of other consumer prices.

It is suggested that the existence of a serious public emergency should be constitutionally required for rent controls because they create uncertainty about returns from capital investment in rental housing and thereby discourage construction or improvement of rental units, exacerbate any rental housing shortage, and so adversely affect the community at large. Such considerations go to the wisdom of rent controls and not to their constitutionality. ▄▄ In determining the validity of a legislative measure under the police power our sole concern is with whether the measure reasonably relates to a legitimate governmental purpose and "[w]e must not confuse reasonableness in this context with wisdom." (*Wilke & Holzheiser, Inc.* v. *Dept. of Alcoholic Bev. Control, supra,* 65 Cal.2d 349, 359; accord, *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 522.)

▄▄ We turn then to the question of whether the imposition of any form of residential rent controls for the purposes stated in the present charter amendment is within defendant's police power in that it is reasonably related to the accomplishment of an objective for which the

power can be exercised. It has long been settled that the power extends to objectives in furtherance of the public peace, safety, morals, health and welfare and "is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life." (*Miller* v. *Board of Public Works, supra,* 195 Cal. 477, 485; accord, *Consolidated Rock Products Co.* v. *City of Los Angeles, supra,* 57 Cal.2d 515, 521-522.) The charter amendment includes in its stated purposes for imposing rent control the alleviation of the ill effects of the exploitation of a housing shortage by the charging of exorbitant rents to the detriment of the public health and welfare of the city and particularly its underprivileged groups. (§ 1.)[28] The amendment thus states on its face the existence of conditions in the city under which residential rent controls are reasonably related to promotion of the public health and welfare and are therefore within the police power.

■ However, the constitutionality of residential rent controls under the police power depends upon the actual existence of a housing shortage and its concomitant ill effects of sufficient seriousness to make rent control a rational curative measure. ■ Although the existence of "constitutional facts" upon which the validity of an enactment depends (see *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 15 [112 Cal.Rptr. 786, 520 P.2d 10]) is presumed in the absence of any showing to the contrary (*In re Petersen* (1958) 51 Cal.2d 177, 182 [331 P.2d 24]; *Hart* v. *City of Beverly Hills* (1938) 11 Cal.2d 343, 348 [79 P.2d 1080]), their nonexistence can properly be established by proof. (*D'Amico* v. *Board of Medical Examiners* (1970) 6 Cal.App.3d 716, 727 [86 Cal.Rptr. 245]; see *U.S.* v. *Carolene Products Co.* (1938) 304 U.S. 144, 152 [82 L.Ed. 1234, 1241, 58 S.Ct. 778].)

In the present case the trial court received evidence presented by the parties from which it made findings concerning the existence of facts justifying the rent control provisions of the charter amendment and concluded that the emergency conditions that the court deemed constitu-

---

[28]The text of the charter amendment's section 1 is as follows:

"Statement of Purpose. A growing shortage of housing units resulting in a critically low vacancy rate, rapidly rising and exorbitant rents exploiting this shortage, and the continuing deterioration of the existing housing stock constitute a serious public emergency affecting the lives of a substantial proportion of those Berkeley residents who reside in rental housing. These emergency conditions endanger the public health and welfare of the City of Berkeley and especially the health and welfare of the poor, minorities, students and the aged. The purpose of this Article, therefore, is to alleviate the hardship caused by this emergency by establishing a Rent Control Board empowered to regulate residential housing and rentals in the City of Berkeley."

tionally required for rent control did not exist. As already stated no such emergency was constitutionally required. ▓▓ On this state of the record our task is to review the findings (there being no reporter's transcript) and to sustain the propriety of rent controls under the police power unless the findings establish a complete absence of even a debatable rational basis for the legislative determination by the Berkeley electorate that rent control is a reasonable means of counteracting harms and dangers to the public health and welfare emanating from a housing shortage. (*Hamer* v. *Town of Ross* (1963) 59 Cal.2d 776, 783 [31 Cal.Rptr. 335, 382 P.2d 375]; *Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461-462 [202 P.2d 38, 7 A.L.R.2d 990].) In reviewing the findings we also look to the trial court's memorandum opinion as an aid to their interpretation. (*Williams* v. *Puccinelli* (1965) 236 Cal.App.2d 512, 516 [46 Cal.Rptr. 285]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 231, p. 4221.)

Far from dispelling any rational basis for rent control, the findings affirm the existence of housing problems that correspond in kind even if not in degree of gravity with the conditions described in section 1 of the charter amendment (see fn. 28, *ante*). A clause appearing at the outset of the findings on the "emergency" issue states that "whole segments of Berkeley's population suffer from a serious housing shortage." Additional findings indicating serious rental housing problems in Berkeley when the charter amendment was adopted include the following:

1. The City of Berkeley "offers a distinctive and attractive life style, and a superior school system which, because integrated, is desirable to minorities and to young people generally, . . . is the site of the original campus of the University of California and has an established reputation as a university city . . . [, and] is primarily residential in character with some industrial areas."

2. The vacancy rate for residential housing was "in excess of 3%" and "such a vacancy rate is low." According to the court's memorandum opinion, the vacancy rate for *apartment* rental housing was 3.1 percent and "[b]y any standard the rate is low."

3. "The population of [Berkeley] . . . was approximately 116,000 of which approximately 63% were tenants. Of the total population, approximately 30,000 persons comprise a group which spends in excess of 35% of its income for housing . . . . Of said 30,000 persons, about 25,000 were in the group earning under $5,000 per year, and such group consisted

largely of students, low income (aged, minorities, and disabled) and 'other young people' in about equal numbers. . . . It is evident that the housing conditions of low-income persons in Berkeley are serious . . . ."

4. In 1970 Berkeley had a black population of approximately 23.5 percent. These residents have received housing aid from "federally-funded assistance programs" but such programs "have, for the most part, ceased." "Many of the families of South Berkeley and West Berkeley [predominantly black] had low incomes or were receiving public assistance."

5. "[S]ome of the aged and disabled persons in Berkeley suffer adverse conditions in their capability of finding reasonably priced low-cost housing, . . . and it is recognized that aid programs are inadequate for their needs. . . . [T]he housing conditions for such groups in Berkeley were and are serious."

6. The group designated "other young people" "for the main part, consist of non-students who choose to live in Berkeley because they are attracted to its life style. Many of them have marginal incomes and the condition of their housing is generally comparable to that of the low-income group."

Offsetting these findings of serious housing problems are other findings of ameliorative conditions which would provide appropriate material for arguing to a legislative body that it should not enact rent controls but which do not dispel the constitutionally sufficient rational basis for residential rent control provided by the charter amendment's statement of purpose (§ 1; fn. 28, *ante*) and the findings previously summarized. The findings of ameliorative conditions are of three kinds.

First are findings of improvement in housing conditions which state as follows: Between 1960 and 1970 new rental housing increased faster than population and the vacancy rate rose from 2.6 percent in 1971 to 3.1 percent in 1972. At the time of trial further vacancies were expected to result from the carrying out of the plans of certain employers to move out of Berkeley or to reduce personnel. Dormitory space was available for almost all university students needing it and according to a university official adequate financial aid was available for students who established that their parents could not support them. The percentage of rental housing available for less than $200 per month in certain districts of Berkeley in 1970 ranged between 85 and 98 percent. Nonwhite home

ownership increased markedly between 1960 and 1970. While all these facts are encouraging they do not push beyond the pale of rational debate the existence of a housing shortage and accompanying excessive rents serious enough to warrant the imposition of rent controls.

The second category of ameliorative findings consists in comparisons between housing conditions in Berkeley and in adjoining areas. It is found that Berkeley is "part of one continuous urban area geographically indistinguishable from Richmond on the north through Oakland on the south" and that the rental housing vacancy rate in both Richmond and Oakland was 6 percent as compared to 3.1 percent in Berkeley. With respect to the low-income group designated as "other young people" it is found that "their mobility is such as to make it possible for them to live in surrounding, relatively high vacancy areas." On the other hand the finding stating the adverse housing problems faced by the aged and disabled group in Berkeley adds that "their condition is not unlike that experienced in other metropolitan areas."

Neither the availability to some low-income residents of housing in adjoining cities nor the fact that the problems of the aged and disabled in Berkeley are no worse than in other metropolitan areas detracts from Berkeley's power to safeguard and promote the health and welfare of persons who choose to live in that city. ▮ In a field of regulation not occupied by general state law such as rent control each city is free to exercise its police power to deal with its own local conditions which may differ from those in other areas. (See *Galvan* v. *Superior Court, supra,* 70 Cal.2d 851, 863-864.) Among Berkeley's local conditions, according to a previously quoted finding, are a distinctive lifestyle, school system, and reputation as a university city all of which attract residents and offer a likely explanation for a rental housing vacancy rate that is markedly lower than in adjoining cities. Berkeley is not constitutionally required to ignore any of its housing problems on the ground that they would not exist if some of its residents were to live elsewhere.

Finally the findings indicating the existence of serious housing problems are offset by statements in the findings that such problems "are not so wide-spread as to constitute an emergency" and that "no such emergency as referred to in [section 1 of the charter amendment] actually existed." We have already held herein that the existence of such an emergency is not a constitutional prerequisite for the imposition of rent controls. Plaintiffs contend however that the declaration in the charter amendment's preamble of the existence of "a serious public emergency"

with respect to housing problems in Berkeley (§ 1, quoted in fn. 28, *ante*) makes the amendment invalid unless such an emergency actually existed even though the amendment would be valid in the absence of such declaration. With this contention plaintiffs challenge the measure not by disputing its statement of *constitutional* facts but by disputing statements *not necessary* to constitutionality. Their position is that the city electorate cannot have intended to adopt the charter amendment unless the preamble's statement of underlying facts were true and that such truth can be determined by a court which can then declare the measure invalid if it finds upon sufficient evidence that the statement is incorrect.

Even if it be assumed that legislation can be invalidated for mistakes in its preamble concerning facts not essential to constitutionality or legislative authority, the mistakes asserted here are not grounds for invalidation. They involve at most only descriptive differences in the degree of seriousness of the housing problems sought to be remedied and any question of their correspondence with the findings could have been completely eliminated by only minor changes of wording.[29] The preamble accurately declares the nature of the conditions to be alleviated and it is to be presumed that the Berkeley electorate became sufficiently informed from election campaign arguments for and against the measure to decide for themselves whether those conditions gave rise to a "public emergency" or were simply "serious." The ballot argument in favor of the charter amendment contained no representation of the existence of any emergency. We conclude that the "emergency" wording of the preamble did not prevent the adoption of rent controls to deal with those conditions described in the preamble which are consistent with the trial court's findings.

### Constitutional Deficiencies in Charter Amendment's Provisions for Fixing Maximum Rents

[29]Section 1 of the charter amendment would unquestionably be consistent with the findings if the following five words shown as stricken were replaced by the wording shown in italics: "Statement of Purpose. A growing shortage of housing units resulting in a critically low vacancy rate, rapidly rising and exorbitant rents exploiting this shortage, and the continuing deterioration of the existing housing stock constitute a serious public emergency *housing problem* affecting the lives of a substantial proportion of those Berkeley residents who reside in rental housing. These emergency conditions endanger the public health and welfare of the City of Berkeley and especially the health and welfare of the poor, minorities, students and the aged. The purpose of this Article, therefore, is to alleviate the hardship caused by this emergency *problem* by establishing a Rent Control Board empowered to regulate residential housing and rentals in the City of Berkeley."

Having sustained defendant's power to limit residential rents within the city for the purposes stated in the charter amendment, we now consider the constitutionality of the means provided by the amendment for fixing and adjusting permissible rents. As already stated these means are within the police power if they are reasonably related to the legislative purpose. "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." (*Nebbia* v. *New York, supra,* 291 U.S. 502, 539 [78 L.Ed. 940, 958]; accord, *Permian Basin Area Rate Cases* (1968) 390 U.S. 747, 769-770 [20 L.Ed.2d 312, 337-338, 88 S.Ct. 1344].)

The charter amendment declares that its rent control provisions are intended to counteract the ill effects of "rapidly rising and exorbitant rents exploiting [the housing] shortage." (§ 1.) The provisions are within the police power if they are reasonably calculated to eliminate excessive rents and at the same time provide landlords with a just and reasonable return on their property. However, if it is apparent from the face of the provisions that their effect will necessarily be to lower rents more than could reasonably be considered to be required for the measure's stated purpose, they are unconstitutionally confiscatory. (*Power Comm'n* v. *Pipeline Co.* (1942) 315 U.S. 575, 585-586 [86 L.Ed. 1037, 1049-1050, 62 S.Ct. 736]; *Hutton Park Gardens* v. *Town Council, supra,* 68 N.J. 543, 565-571 [350 A.2d 1, 13-16].)

Defendant and interveners contend that any present consideration of the possible confiscatory effect of the charter amendment is premature until the amendment has been allowed to become operative and the actual rent ceilings imposed under it can be measured against constitutional standards. It is true that whether a regulation of prices is reasonable or confiscatory depends ultimately on the result reached. (*Power Comm'n* v. *Hope Gas. Co.* (1944) 320 U.S. 591, 602 [88 L.Ed. 333, 344-345, 64 S.Ct. 281].) However, such a regulation may be invalid on its face when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties. (*City of Miami Beach* v. *Forte Towers, Inc.* (Fla. 1974) 305 So.2d 764, 768; see *Mora* v. *Mejias* (1st Cir. 1955) 223 F.2d 814.) It is to the possibility of such facial invalidity that our present inquiry is directed.

As heretofore explained the charter amendment establishes the maximum rent chargeable for each housing unit by fixing the unit's base

rent and providing for subsequent upward or downward adjustments on a unit-by-unit basis. We consider first the base rent provision. The base rent is stated to be "the rent in effect on August 15, 1971 or any rent in effect subsequent to this date if it was less. If no rent was in effect on August 15, 1971, . . . the base rent shall be established by the [Rent Control] Board based on the generally prevailing rents for comparable units in the City of Berkeley." (§ 4.) Rent control enactments typically use the rent charged on a prior date as a starting point for the fixing of maximum rents on the theory that it approximates the rent that would be paid in an open market without the upward pressures that the imposition of rent control is intended to counteract. (See *Delaware Valley Apt. House Own. Ass'n.* v. *United States* (E.D.Pa. 1972) 350 F.Supp. 1144, aff'd, 482 F.2d 1400; *Chatlos* v. *Brown* (Em.App. 1943) 136 F.2d 490, 493.) The prior date is set early enough to avoid incorporating last-minute increases made by landlords in anticipation of the controls. (See *Marshal House, Inc.* v. *Rent Control Board* (1971) 358 Mass. 686, 701 [266 N.E.2d 876].)

■ Selection of August 15, 1971, as the key date for determination of base rents under the charter amendment was appropriate and reasonable. The possibility of rent controls in Berkeley arose at least as early as March 1971 when controls were recommended in a minority report of the city council's rental housing committee. (See fn. 3, *ante.*) On August 15, 1971, the President of the United States, acting pursuant to the Economic Stabilization Act of 1970 (Pub. L. No. 91-379, 84 Stat. 799), ordered all rents frozen for 90 days at their highest level during the 30-day period prior to August 15, 1971. (Exec. Order No. 11615, 36 Fed. Reg. 15727.) Subsequent rent controls under the act used August 15, 1971, as the primary base date for calculating maximum rents. (See 6 C.F.R., pt. 301, 37 Fed. Reg. 13226 (July 4, 1972).)[30] Thus the advantages of selecting August 15, 1971, as the key date for base rents under the charter amendment were that (1) it marked the latest time at which rents had been set in an unregulated market and (2) the importance of the date under the federal regulatory scheme greatly increased the probability that landlords would have records concerning rents on that date readily available.

The charter amendment provides that the rollback of rents to base levels is to take effect 90 days after election of the rent control board.

---

[30] The act expired on April 30, 1974. (Economic Stabilization Act Amendments of 1973, Pub. L. No. 93-28, § 8, 87 Stat. 29.)

(§ 4.) This election was held on January 23, 1973, but the rollback was enjoined by preliminary injunction on April 26, 1973, and enforcement of the entire charter amendment was thereafter enjoined by the present judgment on June 22, 1973. Plaintiffs contend that marked rises in property taxes, utility rates, and the costs of goods and services since 1973 have eliminated any reasonable grounds which then existed for using August 15, 1971, as a rollback date and have made it highly probable if not certain that the present imposition of such a rollback would reduce rents to confiscatorily low levels pending individual upward adjustments. Interveners reply to this contention by pointing out that the present litigation has caused at least a three-year postponement in the charter amendment's operation which was not contemplated by those who selected the rollback date. Interveners propose that we remedy the problem created by the postponement by setting a new rollback date or by ordering that appropriate relief be provided upon remand. Such action on our part is unnecessary in view of our hereinafter explained conclusion that the charter amendment's provisions for *adjusting* maximum rents are constitutionally insufficient to relieve landlords from confiscatory rent levels even if the base rents were keyed to a more current date. To eliminate any issue of the propriety of using August 15, 1971, as the date for fixing base rents under section 4, we assume for purposes of the remaining discussion that the date used for this purpose would be the date this opinion is filed.

We turn to the charter amendment's provisions for adjustment of maximum rents. Plaintiffs contend that these provisions fail to provide sufficient standards for the guidance of the rent control board in acting upon petitions for increases or decreases in maximum rents and thereby constitute an unlawful delegation of legislative power. ■ A municipal legislative body is constitutionally prohibited from delegating the formulation of legislative policy but may declare a policy, fix a primary standard, and authorize executive or administrative officers to prescribe subsidiary rules and regulations that implement the policy and standard and to determine the application of the policy or standard to the facts of particular cases. (*Kugler* v. *Yocum* (1968) 69 Cal.2d 371, 375-376 [71 Cal.Rptr. 687, 445 P.2d 303].)

The charter amendment provides that "[i]n reviewing . . . petitions for [rent] adjustments, the Board shall consider relevant factors including but not limited to the following: (a) increases or decreases in property taxes; (b) unavoidable increases or decreases in operating and maintenance expenses; (c) capital improvement of the rent-controlled unit, as

distinguished from ordinary repair, replacement and maintenance; (d) increases or decreases in living space, furniture, furnishings or equipment; (e) substantial deterioration of the rent-controlled unit other than as a result of ordinary wear and tear; and (f) failure on the part of the landlord to provide adequate housing services." (§ 5.) It is argued that this listing of factors does not adequately inform either the Board or a court reviewing the Board's actions just how the presence of the factors under particular circumstances is to be translated into dollar increases or decreases in rent. Another criticism is the omission of factors that might have prevented the base rent from reflecting general market conditions such as a seasonal fluctuation in the demand for the kind of housing involved or the existence of a special relationship between landlord and tenant resulting in an undercharging of rent. (See *Hillcrest Terrace Corp.* v. *Brown* (Em.App. 1943) 137 F.2d 663.)

However, section 5 provides that the foregoing factors which it lists are not exclusive but illustrative of the "relevant factors" to be considered by the Board. Moreover, the Board is given other significant guidance by the charter amendment's statement of purpose in section 1. ██ Standards sufficient for administrative application of a statute can be implied by the statutory purpose. (*In re Marks* (1969) 71 Cal.2d 31, 51 [77 Cal.Rptr. 1, 453 P.2d 441]; *In re Petersen, supra,* 51 Cal.2d 177, 185-186.) Here the charter amendment's purpose of counteracting the ill effects of "rapidly rising and exorbitant rents exploiting [the housing] shortage" (§ 1.) implies a standard of fixing maximum rent levels at a point that permits the landlord to charge a just and reasonable rent and no more. (*Hutton Park Gardens* v. *Town Council, supra,* 68 N.J. 543 [350 A.2d 1, 16].) Indeed section 3, subdivision (g), directs the Board to "issue and follow such rules and regulations, including those which are contained in this Article, *as will further the purposes of this Article.*" (Italics supplied.)

"The rule that the statute must provide a yardstick to define the powers of the executive or administrative officer is easy to state but rather hard to apply. Probably the best that can be done is to state that the yardstick must be as definite as the exigencies of the particular problem permit." (*Cal. State Auto. etc. Bureau* v. *Downey* (1950) 96 Cal.App.2d 876, 902 [216 P.2d 882].) By stating its purpose and providing a nonexclusive illustrative list of relevant factors to be considered, the charter amendment provides constitutionally sufficient legislative guidance to the Board for its determination of petitions for adjustments of maximum rents.

However, legislative guidance by way of policy and primary standards is not enough if the Legislature "fail[s] to establish an effective mechanism to assure the proper implementation of its policy decisions." (*Kugler* v. *Yocum, supra,* 69 Cal.2d 371, 376-377.) "The need is usually not for standards but for safeguards. . . . When statutes delegate power with inadequate protection against unfairness or favoritism, and *when such protection can easily be provided,* the reviewing courts may well either insist upon such protection or invalidate the legislation." (Italics supplied.) (1 Davis, Administrative Law Treatise (1958) § 2.15; see *Kugler* v. *Yocum, supra,* 69 Cal.2d at p. 381.)

■ Here the charter amendment drastically and unnecessarily restricts the rent control board's power to adjust rents, thereby making inevitable the arbitrary imposition of unreasonably low rent ceilings. It is clear that if the base rent for all controlled units were to remain as the maximum rent for an indefinite period many or most rent ceilings would be or become confiscatory. For such rent ceilings of indefinite duration an adjustment mechanism is constitutionally necessary to provide for changes in circumstances and also provide for the previously mentioned situations in which the base rent cannot reasonably be deemed to reflect general market conditions. The mechanism is sufficient for the required purpose only if it is capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary. "Property may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them . . . ." (*Smith* v. *Illinois Bell Tel. Co.* (1926) 270 U.S. 587, 591 [70 L.Ed. 747, 749, 46 S.Ct. 408] (enjoining enforcement of telephone rates because of unreasonable delay in acting upon application for rate increase).) The charter amendment is constitutionally deficient in that it withholds powers by which the rent control board could adjust maximum rents without unreasonable delays and instead requires the Board to follow an adjustment procedure which would make such delays inevitable.

The provisions of the charter amendment in which those delays inhere must be examined in relation to the magnitude of the job to be done. The amended complaint alleges that Berkeley has some 30,000 rental units of which 22,000 are subject to rent control under the charter amendment. Although this allegation is denied for lack of sufficient information or belief and the findings do not directly resolve the issue, they do state that the city's population is 116,000 of whom 63 percent, or 73,080, are tenants. The findings also indicate that the city has at least

16,000 rental units, and the trial court's memorandum opinion indicates there are over 17,000 *apartment* rental units.[31]

The Board has no power to adjust rent ceilings on any one of these thousands of units until it has received a separate petition for that unit and considered the petition at an adjustment hearing. (§ 5, 1st. par.; § 6, subd. (a); see fn. 7, *ante*.) A landlord may not file a petition without simultaneously filing a certificate from the city building inspection service that the premises comply with state and city codes based upon an inspection made within the preceding six months. (§ 5, 3d par.)[32] Consolidation of petitions for hearing is permitted only if they relate to units in the same building and then only with the written consent of a majority of the tenants. (§ 6, subd. (h).)[33] Any rent adjustment must be "supported by the preponderance of the evidence submitted at the hearing." (§ 6, subd. (g).) The public hearing record must include "all exhibits, papers and documents required to be filed or accepted into evidence during the proceeding; a list of all participants present; a summary of all testimony accepted in the proceeding; a statement of all

---

[31]A finding states that "there existed a vacancy rate in excess of 3% (actual number of vacancies approximating 500 rental units)" and another finding states the vacancy rate "increased from 2.6% to 3.1% between 1971 and 1972." The memorandum opinion states that "the apartment rental unit vacancy rate rose from 2.6 in 1971 to 3.1 in 1973. (In actual numbers, an increase from 467 to 534.)" The indicated number of units is determined by dividing the vacancy rate into the number of vacancies.

[32]Defendant contends that "nothing in the law's procedures prevents consideration by the Board of a petition for rental adjustment that is not accompanied by a building certification" and that "the Board may consider a petition which is accompanied by an adequate excuse for the failure to supply a building certification—such as delay by the City Building and Inspection Services." But the charter amendment (§ 5) states unequivocally that "[a]ny landlord who petitions the Board for an upward rent adjustment *shall* file with such petition a certification . . . that the premises in question are in full and complete compliance with the applicable [codes] . . . ." (Italics supplied.) The power of the board to make findings contrary to the certificate and nevertheless grant a rent increase does not affect the requirement that the certificate be filed.

Plaintiffs contend that the charter amendment would deny them due process by failing to provide landlords with any remedy against arbitrary refusal of the required certification or unreasonable delay in *its* issuance. Nothing in the charter amendment inhibits defendant's city council, Board or other organs from exercising their respective powers to prevent or alleviate such refusals or delays and therefore we cannot assume that any such denial of due process would occur.

[33]Defendant argues that "there is no proscription against consolidating petitions and hearing procedures on the petitions submitted, in order to make [rental] adjustments, except in the case of petitions relating to rent-controlled units in the same building where written consent of a majority of tenants is required." We disagree. The requirement of written consent for consolidation of petitions for units in the same building evinces a policy of prohibiting the Board from consolidating petitions that are *less* related in that they pertain to separate buildings.

materials officially noticed; all findings of fact; the ruling on each exception or objection, if any are presented; all recommended decisions, orders or rulings; all final decisions and/or orders; and the reasons for each recommended and each final decision, order or ruling." (§ 6, subd. (f).)

Moreover, the Board is precluded from delegating the holding of hearings to a staff person or even to one or a panel of its members. No adjustment can be granted "until after *the Board* considers the petition *at an adjustment hearing.*" (Italics supplied.) (§ 6, subd. (a).) Of the five members of the Board (§ 3, subd. (a)) three constitute a quorum and "[t]hree affirmative votes are required for a decision, including all motions, orders, and rulings of the Board." (§ 3, subd. (i).) Yet Board members are not compensated as full-time officials. Each member is to be paid $50 per meeting but is limited to a maximum annual compensation of $2,400. (§ 3, subd. (k).)

These provisions put the Board in a procedural strait jacket. It cannot order general rental adjustments for all or any class of rental units based on generally applicable factors such as property taxes.[34] It cannot terminate controls over any housing. It cannot consider a landlord's petition that is not accompanied by a current building inspection certificate of code compliance. It cannot dispense with a full-blown hearing on each adjustment petition even though all nonpetitioning parties are given ample notice and none requests to be heard. It cannot accept petitions pertaining to more than one unit or consolidate petitions pertaining to individual units for hearing even in the absence of objection except when the majority of the tenants in a building give written consent to consolidation of the petitions relating to that building.[35] It cannot delegate the holding of hearings to a hearing officer or a member of the Board. In short, it is denied the means of reducing its job to manageable proportions through the formulation and application of general rules, the appropriate delegation of responsibility, and the focusing of the adjudicative process upon issues which cannot fairly be resolved in any other way.

---

[34]Section 3, subdivision (g), directs the Board to "issue and follow such rules and regulations . . . as will further the purposes of this Article," but such rules could not undercut the express provision that "[n]o rent adjustment shall be granted unless supported by the preponderance of the evidence submitted at the hearing" (§ 6, subd. (g)).

[35]Although tenants of a building would have an understandable motive for agreeing to consolidation of their own petitions for rent *decreases,* they would ordinarily have little or nothing to gain from signing a consent to a consolidation designed to make it easier for the landlord to obtain permission to raise their rents.

The impracticability of regulating an enormous number of highly varied transactions wholly on a case-by-case basis has frequently led to regulation by means of rules and schedules derived from evidence typical of the members of the regulated group, subject to the right of any member to make a showing of sufficient deviation from the norm to warrant special treatment. One of the important reasons that hearings on the circumstances of each individual's situation are not constitutionally required for the imposition of regulation in such cases is that such individual treatment would be impracticable. (*Permian Basin Area Rate Cases, supra,* 390 U.S. 747, 756-758, 768-770 [20 L.Ed.2d 312, 329-331, 336-338]; *Chicago & N. W. R. Co.* v. *A., T. & S. F. R. Co.* (1967) 387 U.S. 326, 340-343 [18 L.Ed.2d 803, 813-816, 87 S.Ct. 1585]; *New England Divisions Case* (1923) 261 U.S. 184, 196-199 [67 L.Ed. 605, 612-614, 43 S.Ct. 270]; *Wilson* v. *Brown* (Em.App. 1943) 137 F.2d 348, 352-354; *Amalgamated Meat Cutters & Butcher Work.* v. *Connally* (D.D.C. 1971) 337 F.Supp. 737, 758.) In the present case the *imposition* of rent ceilings in the form of a rollback to base rents is virtually automatic. Thereafter, regardless of how inequitable any rent ceiling may be under all the circumstances, it cannot be adjusted except by a procedure that inherently and unnecessarily precludes reasonably prompt action except perhaps for a lucky few.

Defendant and interveners argue that any concern over whether maximum rents will be adjusted with a constitutional minimum of promptitude is speculative and premature because it must be presumed that the Board will not deliberately deprive landlords of their constitutional rights. They refer us to *Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 149 [82 P.2d 434, 126 A.L.R. 838], where we said: "It is to be presumed that the board will exercise its powers in conformity with the requirements of the Constitution; and if it does act unfairly, the fault lies with the board *and not the statute.*" (Italics supplied.) The delays in rent adjustment with which we are concerned stem not from any anticipated dereliction of duty on the part of the rent control board but from defects in the charter amendment itself.[36]

---

[36]Interveners postulate that a landlord's application for an upward rent adjustment under the charter amendment would be acted upon in two or three months, citing a study which states that under the Massachusetts rent control law (Mass. Acts 1970, ch. 842) "[t]he average length of time between filing a petition and receiving a decision from the Rent Control Board ranges from four to five weeks in Somerville to 10 to 12 weeks in Brookline." But the Massachusetts statute gives local rent control boards the very powers which we have described as being withheld from the Berkeley Board by the charter amendment.

Interveners also attach to one of their briefs a declaration of the person who served as the Berkeley Rent Control Board's chief executive officer prior to the judgment below,

A different question would be presented if the delays inherent in the charter amendment's requirement that rents be adjusted only on the basis of unit-by-unit hearings before a single tribunal were essential to its purpose. Clearly the Board's powers could be broadened so as to ameliorate the delays sufficiently while preserving the rights of all concerned. Nor do we preclude the possibility of other legislative solutions to the problem. But under the charter amendment as it now stands the combination of the rollback to base rents and the inexcusably cumbersome rent adjustment procedure is not reasonably related to the amendment's stated purpose of preventing excessive rents and so would deprive the plaintiff landlords of due process of law if permitted to take effect.

Finally there appears no way of severing the invalid limitations on the Board's powers to adjust maximum rents from the remainder of the charter amendment. The constitutional defect cannot be cured simply by excision but only by additional provisions that are beyond our power to provide. (*Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860, 871 [94 Cal.Rptr. 777, 484 P.2d 945].) Moreover, the argument in support of the charter amendment distributed to the electors who voted on its adoption assured

describing the Board's plans for dealing with petitions for rent adjustments. We consider the declaration not as evidence of any facts or occurrences but for whatever light it may shed on the kinds of adjustment procedures that might be possible under the charter amendment. The declaration states in part: [¶] "The Board never completed action on determining the exact procedures to be followed in dealing with applications for rent adjustments. However, all of the proposals being considered involved the development of standardized formulae and procedures for determining the approved rent on any given rental unit. The Board's goal was to develop a formula that would allow it to calculate the rent it would approve on a given housing unit simply by taking into account data that would be provided yearly involving the owner's costs and equity investment in the building being considered. To the figure thus calculated, an adjustment would be made depending upon whether the building was 'average,' 'above average,' or 'below average,' in its condition and maintenance. Evidence as to condition and maintenance would be provided by the owner and tenants themselves as well as investigators working for the Board. The goal of these procedures was to be standardized and virtually automatic decisions in cases, with the Board setting policies to be administered by its staff. These policies would, hopefully, minimize contested hearings and allow decisions in the overwhelmingly vast majority of cases to be worked out informally by interested parties and the Board staff. Where decisions could not be worked out informally, hearing would be held by Board hearing officers with final decisions to be made by the Board. With these procedures, we anticipated that any given rent adjustment request could be handled and closed within 30 to 45 days."

The difficulty with these plans is that they were beyond the Board's powers under section 6. Rent adjustment decisions could not be worked out informally between the parties and the Board staff but in *all* cases would have to be based on the preponderance of the evidence submitted at a hearing on a particular rental unit, documented by a detailed hearing record. Moreover, hearings could not be held by "hearing officers" but only by the Board itself.

them that the measure "establishes an elected five member Rent Control Board to regulate rents . . . and evictions in Berkeley on a case by case basis. . . . [T]he plan proposed here is extremely flexible [*sic*], with each case handled individually by the Board." Thus it is by no means clear that the electorate would have approved the measure if the Board had been given broader rental adjustment powers. (See *Methodist Hosp. of Sacramento* v. *Saylor* (1971) 5 Cal.3d 685, 695 [97 Cal.Rptr. 1, 488 P.2d 161]; *Carter* v. *Seaboard Finance Co.* (1949) 33 Cal.2d 564, 580-582 [203 P.2d 758].)

The judgment is affirmed.

McComb, J., Tobriner, J., Mosk, J., Sullivan, J., Clark, J., and Richardson, J., concurred.

---

APPENDIX: AMENDMENT TO BERKELEY CITY CHARTER
(Stats. 1972 (Reg. Sess.) res. ch. 96, p. 3372)

That the first sentence of Section 8 of Article V of the Charter of the City of Berkeley be amended and a new Article XVII, consisting of twelve (12) sections, be added to the Charter of the City of Berkeley to read as follows:

Section A. Add the following new Article XVII:

1. Statement of Purpose. A growing shortage of housing units resulting in a critically low vacancy rate, rapidly rising and exorbitant rents exploiting this shortage, and the continuing deterioration of the existing housing stock constitute a serious public emergency affecting the lives of a substantial proportion of those Berkeley residents who reside in rental housing. These emergency conditions endanger the public health and welfare of the City of Berkeley and especially the health and welfare of the poor, minorities, students and the aged. The purpose of this Article, therefore, is to alleviate the hardship caused by this emergency by establishing a Rent Control Board empowered to regulate residential housing and rentals in the City of Berkeley.

2. Definitions: The following words or phrases as used in this Charter Amendment shall have the following meanings:

a) Board: The Rent Control Board established by Section 3 of this amendment.

b) Commissioners: Commissioners of the Rent Control Board established by Section 3 of this amendment.

c) Controlled rental units: All rental units in the City of Berkeley except:

(1) rental units in hotels, motels, inns, tourist homes and rooming and boarding houses which are rented primarily to transient guests for a period of less than fourteen (14) days;

(2) rental units in non-profit cooperatives;

(3) rental units in any hospital, convent, monastery, extended medical care facility, asylum, non-profit home for the aged, or dormitory owned and operated by an institution of higher education;

(4) rental units which a governmental unit, agency or authority either owns, operates, manages, or subsidizes.

d) Housing services: Housing services include but are not limited to repairs, replacement, maintenance, painting, providing light, heat, hot and cold water, elevator service, window shades and screens, storage, kitchen, bath and laundry facilities and privileges, janitor services, refuse removal, furnishings, telephone, and any other benefit, privilege or facility connected with the use or occupancy of any rental unit. Services to a rental unit shall include a proportionate part of services provided to common facilities of the building in which the rental unit is contained.

e) Landlord: An owner, lessor, sublessor or any other person entitled to receive rent for the use and occupancy of any rental unit, or an agent or successor of any of the foregoing.

f) Rent: The consideration, including any bonus, benefits or gratuity demanded or received for or in connection with the use or occupancy of rental units or the transfer of a lease for such rental units, including but not limited to monies demanded or paid for parking, pets, furniture, subletting and security deposits for damages and cleaning.

g) Rental housing agreement: An agreement, verbal, written or implied, between a landlord and tenant for use or occupancy of a rental unit and for housing services.

h) Rental units: Any building, structure, or part thereof, or land appurtenant thereto, or any other real property rented or offered for rent for living or dwelling purposes, including houses, apartments, rooming or boarding house units, and other properties used for living or dwelling purposes, together with all housing services connected with the use or occupancy of such property.

i) Tenant: A tenant, subtenant, lessee, sublessee or any other person entitled under the terms of a rental housing agreement to the use or occupancy of any rental unit.

3. Rent Control Board:

a) Composition: There shall be in the City of Berkeley a Rent Control Board. The Board shall consist of five elected Commissioners. The Board shall elect annually as chairwoman or chairman one of its members to serve in that capacity.

b) Eligibility: Residents of the City of Berkeley who are duly qualified electors of the City of Berkeley are eligible to serve as Commissioners of the Rent Control Board.

c) Full disclosure of holdings: Candidates for the position of Rent Control Board Commissioner, in addition to fulfilling the requirements of Article III, Section 6½, when filing nomination papers, shall submit a verified statement listing all of their interests and dealings in real property, including but not limited to its ownership, sale or management, and investment in and association with partnerships, corporations, joint ventures and syndicates engaged in its ownership, sale or management, during the previous three (3) years.

d) Method of election: Commissioners shall be elected at general municipal elections in the same manner as set forth in Article III, except that the first Commissioners shall be elected within 180 days after approval of this Article by the State Legislature in accordance with the provisions of Article III.

e) Term of office: Commissioners shall be elected to serve terms of four years, except that of the first five Commissioners elected in accordance with Section 3(d), the two Commissioners receiving the most votes shall serve until the first general municipal election held more than three years after their election and the remaining three Commissioners shall serve until the first general municipal election held more than one year after their election. Commissioners shall serve a maximum of two full terms.

f) Powers and duties: The Rent Control Board is empowered to set maximum rents for all residential rental units in the City of Berkeley with the exception of those classes

of units exempted under Section 2(c). The Board is empowered to roll back rents to a base rent established under Section 4(a). The Board is empowered to adjust maximum rents either upward or downward after conducting appropriate investigations and hearings as provided under Section 6. The Board may make such studies and investigations, conduct such hearings, and obtain such information as is necessary to carry out its powers and duties. The Board may seek injunctive relief under the provisions of Section 11 in order to carry out its decisions and may settle civil claims in accordance with the provisions of Section 10.

g) Rules and regulations: The Rent Control Board shall issue and follow such rules and regulations, including those which are contained in this Article, as will further the purposes of this Article. The Board shall publish its rules and regulations prior to promulgation in at least one newspaper with general circulation in the City of Berkeley. All rules and regulations, internal staff memoranda, and written correspondence explaining the decisions and policies of the Board shall be kept in the Board's office and shall be available to the public for inspection and copying. The Board shall publicize this Charter Amendment through the media of signs, advertisements, flyers, leaflets, announcements on radio and television, newspaper articles and other appropriate means, so that all residents of Berkeley will have the opportunity to become informed about their legal rights and duties under rent control in Berkeley.

h) Meetings: The Board shall hold two regularly scheduled meetings per month. Special meetings may be called upon the request of at least two Commissioners. All meetings shall be open to the public. Maximum rent adjustment and eviction hearings shall be conducted in accordance with the provisions of Sections 6 and 7.

i) Quorum: Three Commissioners shall constitute a quorum. Three affirmative votes are required for a decision, including all motions, orders, and rulings of the Board.

j) Dockets: The Board shall maintain and keep in its office rent adjustment and eviction certificate hearing dockets. Said dockets shall list the time, date, place of hearing, parties involved, the addresses of the buildings involved, and the final disposition of the petitions heard by the Board.

k) Compensation: Each Commissioner shall receive for every meeting fifty dollars ($50.00), but in no event shall any Commissioner receive in any twelve month period more than twenty-four (24) hundred dollars for services rendered.

l) Vacancies: If a vacancy shall occur on the Board, the Board shall appoint a qualified person to fill such a vacancy until the following general municipal election when a qualified person shall be elected to serve for the remainder of the term.

m) Recall: Commissioners may be recalled in accordance with the provisions of Article IV of the Charter of the City of Berkeley.

n) Staff: The Board shall employ, subject to the approval of the City Council, such staff as may be necessary to perform its functions. Board staff shall not be subject to the requirements of Article VII, Section 28 (b) and (c) and Article IX, Section 56 of the City Charter.

4. Maximum Rent:

a) Base rent: The base rent shall be the rent in effect on August 15, 1971 or any rent in effect subsequent to this date if it was less. If no rent was in effect on August 15, 1971, as in the case of newly constructed units completed after this date, the base rent shall be established by the Board based on the generally prevailing rents for comparable units in the City of Berkeley. The base rent shall take effect ninety (90) days after the election of the Board and the Board shall administer a rollback of rents in all controlled units to this level and shall determine, where necessary, the actual rent level in effect on August 15, 1971. Upon approval of this Charter Amendment by the California State Legislature and pending the establishment of base rents and the rollback of rents to the base rent level, no landlord shall increase rents in a rent-controlled unit.

b) Registration: The Board shall require registration of all rent-controlled units, their

base rents, and the housing services provided on forms authorized and voted by the Board.

5) Maximum Rent Adjustments:

The Board may make individual rent adjustments, either upward or downward, of the maximum rent established as the base rent for rent-controlled units under Section 4(a). The Board shall receive petitions from landlords and tenants for such adjustments, and shall conduct hearings in accordance with the provisions of Section 6 to rule on said petitions.

In reviewing such petitions for adjustments, the Board shall consider relevant factors including but not limited to the following: a) increases or decreases in property taxes; b) unavoidable increases or decreases in operating and maintenance expenses; c) capital improvement of the rent-controlled unit, as distinguished from ordinary repair, replacement and maintenance; d) increases or decreases in living space, furniture, furnishings or equipment; e) substantial deterioration of the rent-controlled unit other than as a result of ordinary wear and tear; and f) failure on the part of the landlord to provide adequate housing services.

Any landlord who petitions the Board for an upward rent adjustment shall file with such petition a certification from the City of Berkeley Building Inspection Service which states that the premises in question are in full and complete compliance with the applicable State of California Health and Safety Codes and the City of Berkeley Housing Code based on an inspection made no more than six months prior to the date of the landlord's petition. Such certification shall be prima facie evidence of the nonexistence of Code violations, rebuttable by other competent evidence introduced by the tenant, certification notwithstanding. The Board may refuse to grant an upward adjustment if it determines that the rent-controlled unit in question does not comply with the requirements of the aforementioned Codes and if it determines that such lack of compliance is due to the landlord's failure to provide normal and adequate housing services.

6. Maximum Rent Adjustment Hearings:

a) Petitions: The Board shall consider an adjustment of rent for an individual rent-controlled unit upon receipt of a petition for adjustment filed by the landlord or tenant of such a unit on a form provided by the Board. No such adjustment shall be granted until after the Board considers the petition at an adjustment hearing.

b) Notice: The Board shall notify the landlord, if the petition was filed by the tenant, or the tenant, if the petition was filed by the landlord, of the receipt of such a petition. The Board shall schedule a hearing no earlier than the sixteenth (16th) day after the postmark of the notice of the hearing sent to the parties and shall notify both parties as to the time, date and place of the hearing. Hearings shall be scheduled for times most convenient for all parties, including evenings and weekends. Hearings may be postponed or continued for good cause provided that all parties receive timely notice of such action.

c) Records: The Board may require either party to a rent adjustment petition to provide it with all pertinent books, records and papers. Such documents shall be made available to the parties involved at least seven days prior to the hearing at the office of the Rent Control Board.

d) Open hearings: All rent adjustment hearings shall be open to the public.

e) Right to assistance: All parties to a hearing may have assistance in presenting evidence and developing their position from attorneys, legal workers, tenant union representatives or any other persons designated by said parties.

f) Hearing record: The Board shall make available for inspection and copying by any person an official record which shall constitute the exclusive record for decision on the issues at the hearing. The record of the hearing, or any part of one, shall be obtainable for the cost of copying. The record of the hearing shall include: all exhibits, papers and

documents required to be filed or accepted into evidence during the proceeding; a list of participants present; a summary of all testimony accepted in the proceeding; a statement of all materials officially noticed; all findings of fact; the ruling on each exception or objection, if any are presented; all recommended decisions, orders or rulings; all final decisions and/or orders; and the reasons for each recommended and each final decision, order or ruling.

g) Decisions: The Board shall make a final decision no later than fifteen days after the conclusion of the hearing. No rent adjustment shall be granted unless supported by the preponderance of the evidence submitted at the hearing. All parties to a hearing shall be sent a notice of the Board's decision and a copy of the findings of fact and law upon which said decision is based. At the same time, parties to the proceeding shall also be notified of their right to judicial review of the decision pursuant to Section 9 of this Charter Amendment.

h) Consolidation: The Board may consolidate petitions relating to rent-controlled units in the same building with the written consent of a majority of the tenants and all such petitions may be considered in a single hearing.

i) Repetition: Notwithstanding any other provision of this Section, the Board may, without holding a hearing, refuse to adjust a maximum rent level upward for an individual rental unit if a hearing has been held with regard to the rental level of such unit within the prior twelve months.

j) Inadequate or false information: If information filed in a petition for rent adjustment or in additional submissions filed at the request of the Board is inadequate or false, no action shall be taken on said petition until the deficiency is remedied.

7. Evictions:

a) No landlord shall bring any action to recover possession of a rent-controlled unit unless:

(1) the tenant has failed to pay the rent to which the landlord is entitled under the rental housing agreements; (2) the tenant has violated an obligation or covenant of her or his tenancy other than the obligation to surrender possession upon proper notice and has failed to cure such violation after having received written notice thereof from the landlord; (3) the tenant is committing or permitting to exist a nuisance in, or is causing substantial damage to, the rent-controlled unit, or is creating a substantial interference with the comfort, safety or enjoyment of the landlord or other occupants of the same; (4) the tenant is convicted of using or permitting a rent-controlled unit to be used for any illegal purpose; (5) the tenant, who had a rental housing agreement which has terminated has refused after written request or demand by the landlord, to execute a written extension or renewal thereof for a further term of like duration and in such terms as are not consistent with or violative of any provisions of this Charter Amendment and are materially the same as in the previous agreement; (6) the tenant has refused the landlord reasonable access to the rent-controlled unit for the purpose of making necessary repairs or improvement required by the laws of the United States, the State of California or any subdivision thereof, or for the purpose of inspection as permitted or required by the rental housing agreement or by law or for the purpose of showing the rental housing unit to any prospective purchaser or mortgagee; (7) the tenant holding at the end of the term of the rental housing agreement is a subtenant not approved by the landlord; (8) the landlord seeks to recover possession in good faith for use and occupancy of herself or himself, of her or his children, parents, brother, sister, father-in-law, mother-in-law, son-in-law, or daughter-in-law; or (9) the landlord seeks to recover possession to demolish or otherwise remove the rent-controlled unit from housing use.

b) A landlord seeking to recover possession of a rent-controlled unit shall apply to the Board for a certificate of eviction. Such application shall include a copy of the notice to quit served on the tenant(s) and must contain statements made under pains and penalties

of perjury that: (1) there are no outstanding Code violations on the premises or, if there are any, they were all substantially caused by the present tenants; (2) the landlord or her or his agent has properly sent to or personally served on the tenant a notice terminating the tenancy and said notice has taken legal effect; and (3) there exist facts which justify issuance of a certificate of eviction under Section 7(a).

c) The Board shall notify all concerned tenants of the landlord's application for a certificate of eviction and of their right to contest issuance of such a certificate by requesting a hearing within five (5) days after receiving such notification from the Board. Said notification shall include a copy of the landlord's application and statements and attachments.

d) If the tenant requests such a hearing, the Board shall schedule such a hearing within seven (7) days after receipt of the tenant's request and notify all parties as to the time, date and place of the hearing.

e) At said hearing the burden of proof is on the landlord to prove the facts attested to in her or his application. No eviction certificate shall be issued if: (1) the landlord fails to prove that no Code violations exist on the premises or that any violations which do exist were substantially caused by the present tenant(s); or (2) the eviction is in retaliation for reporting Code violations or violations of this Article, or for organizing other tenants, or for enforcing rights under this Charter Amendment. The provisions of Section 6(d), (e), (f), (g), (h), (i), and (j) apply in a similar manner to eviction hearings.

f) The Board shall grant or deny the certificate of eviction within five (5) days after a hearing is held on the landlord's application.

g) A landlord who seeks to recover possession of a rent-controlled unit without first obtaining a certificate of eviction or who recovers possession without first obtaining a certificate of eviction shall be in violation of this Article and shall be subject to the civil penalties available to the Board, the City or the tenant under Section 10. This subsection shall not apply if, after the landlord has applied for a certificate of eviction, the tenant voluntarily abandons the rent-controlled unit. The provisions of this Section shall be construed as additional restrictions on the right to recover possession of rent-controlled units. No provision of this Section shall entitle any landlord to recover possession of such a rent-controlled unit. Upon a decision of the Board concerning the granting or withholding of a certificate of eviction, either party may seek judicial review of this decision in accordance with the provisions of Section 9.

8. Non-Waiverability:

Any provision whether oral or written, in or pertaining to a rental housing agreement whereby any provision of this Article for the benefit of a tenant is waived, shall be deemed to be against public policy and shall be void.

9. Judicial Review:

A landlord or tenant aggrieved by any action, regulation, or decision of the Board may seek judicial review by appealing to the appropriate court within the jurisdiction.

10. Civil Remedies:

a) Any landlord who demands, accepts, receives, or retains any payment of rent in excess of the maximum lawful rent, in violation of the provisions of this Article or any rule, regulation or order hereunder promulgated, shall be liable as hereinafter provided to the tenant from whom such payment is demanded, accepted, received or retained, for reasonable attorney's fees and costs as determined by the court, plus damages in the amount of two hundred dollars ($200.00) or not more than three (3) times the amount by which the payment or payments demanded, accepted, received or retained, whichever is the greater.

b) If the tenant from whom such payment is demanded, accepted, received, or retained in violation of the provisions of this Article or any rule, regulation or order hereinunder promulgated fails to bring an action under this Section within thirty days from the date of the occurrence of the violation, the Board may settle the claim arising out of the violation or bring such action. Thereinafter, the tenant on whose behalf the Board acted is barred from also bringing action against the landlord in regard to the same violation for which the Board has made a settlement. In the event the Board settles said claim, it shall be entitled to retain the costs it incurred in the settlement thereof, and the tenant against whom the violation has been committed shall be entitled to the remainder.

c) A judgment for damages or on the merits in any action under this Section shall be a bar to any recovery under this Section against the same landlord on account of any violation with respect to the same tenant prior to the institution of the action in which such judgment was rendered. Action to recover liquidated damages under the provisions of this Section shall not be brought later than one year after the date of the violation.

d) The Municipal or Superior Court, as the case might be, within which the rent-controlled unit affected is located shall have jurisdiction over all actions and complaints brought under this Section.

e) Any tenants who have paid in excess of the maximum rent set by the Board as determined at a hearing held by the Board or whose rent was suspended due to a violation of this Article shall be entitled to a refund in the amount of the excess payment. Tenants may elect to deduct such amount of the refund due them from their future rent payments, rather than pursuing the remedy provided under Section 10(a), provided that they inform the landlord in advance in writing as to their intention to do so. Tenants shall not be penalized by landlords for deducting their refund pursuant to this Section.

f) If a landlord evicts a tenant without a certificate of eviction obtained from the Board, the tenants' obligation to pay rent to the landlord during the period beginning with the date of the actual eviction and continuing for the period in which the tenant is dispossessed for a maximum of one year is automatically suspended and the tenant is entitled to a refund of rent in accordance with the provisions of Section 10(e).

11. Injunctive Relief: The Board and tenants and landlords of rent-controlled units may seek relief from a Municipal or Superior Court to restrain by injunction any violation of this Article and of the rules, regulations and decisions of the Board.

12. Partial Invalidity: If any provision of this Article or application thereof to any person or circumstances is held invalid, this invalidity shall not affect other provisions or applications of this Article which can be given effect without the invalid provision or application, and to this end the provisions of this Article are declared to be severable.

Section B. The first sentence of Section 8, Article V of the Charter of the City of Berkeley is amended to read as follows: "The elective officers of the City shall be a Mayor, an Auditor, eight (8) Council Members, five (5) School Directors, and five (5) Rent Control Board Commissioners."